**In re PETTERS COMPANY, INC., et al., Debtors (includes: Petters Group Worldwide, LLC; PC Funding, LLC; Thousand Lakes, LLC; SPF Funding, LLC; PL Ltd., Inc.; Edge One LLC; MGC Finance, Inc.; PAC Funding, LLC; Palm Beach Finance Holdings, Inc.).**

Court File Nos. 08–45257, 08–45258(GFK), 08–45326(GFK), 08–45327(GFK), 08–45328(GFK), 08–45329(GFK), 08–45330(GFK), 08–45331(GFK), 08–45371(GFK), 08–45392(GFK).

United States Bankruptcy Court, D. Minnesota.

Signed Nov. 22, 2013.

Adam C. Ballinger, K. Jon Breyer, Terrence J. Fleming, Kirstin D. Kanski, Mark D. Larsen, James A. Lodoen, George H. Singer, Sandra S. Smalley–Fleming, Jeffrey D. Smith, Lindquist & Vennum LLP, Minneapolis, MN, Richard B. Drubel, Ethan Frechette, Matthew J. Henken, Kimberly H. Schultz, Boies, Schiller & Flexner, LLP, Oakland, CA, Elisebeth Collins Cook, Joseph L. Fogel, Michael J. Kelly, Neal H. Levin, Patrick J. Woytek, Freeborn & Peters LLP, Chicago, IL, Sarah E. Doerr, Issa K. Moe, Moss & Barnett, Minneapolis, MN, Adam A. Gillette, Thomas E. Jamison, Lori A. Johnson, Douglas L. Elsass, Fruth Jamison & Elsass PLLC, Minneapolis, MN, Stacy L. Kabele, Josiah O. Lamb, Patricia A. Pedersen, Steven E. Wolter, Kelley Wolter & Scott PA, Minneapolis, MN, The Law Office of Mark A. Weisbart, Winderweedle, Haines, Ward & Woodman, P.A., Withers BVI, Rassers NV, for Douglas A. Kelley, Kelley & Wolter PA (Trustee).

Matthew J. Henken, Ethan Frechette, Richard B. Drubel, Matthew J. Henken, Kimberly H. Schultz, Richard B. Drubel, Boies, Schiller & Flexner LLP, Hanover, NH, James A. Lodoen, Jeffrey D. Smith, James A. Lodoen, Jeffrey D. Smith, Lindquist & Vennum, Minneapolis, MN, for Debtor.

Michael R. Fadlovich, Robert Raschke, Michael E. Ridgway, U.S. Trustee Office, Minneapolis, MN, for U.S. Trustee.

## ORDER GRANTING TRUSTEE'S MOTION FOR SUBSTANTIVE CONSOLIDATION

GREGORY F. KISHEL, Chief Judge.

## INTRODUCTION

In the 1990s and the early years of the 2000s, Thomas J. Petters was a large public presence in the business and social community of Minnesota. Through holding companies he acquired full or partial ownership of several prominent business operations, including Sun Country Airlines, the Polaroid Corporation, and the Fingerhut Companies. Through other entities in his enterprise structure, he held himself out as an adept intermediator of consumer goods at the distribution level of the retail supply chain.

On September 24, 2008, the Federal Bureau of Investigation executed a search warrant at the Petters corporate headquarters in Minnetonka and other locations. On October 3, 2008, Tom Petters was arrested by the federal authorities. Soon after, he was charged in the United States District Court with the offenses of mail and wire fraud, money laundering, and conspiracy.

At the instance of the United States, a receivership proceeding over Tom Petters and a number of other persons and entities was commenced as an ancillary to the criminal cases. Between October 11 and 19, 2008, the Receiver filed petitions for bankruptcy relief under Chapter 11 for a number of the corporate entities in Tom Petters's business structure. This commenced the cases at bar. The cases were put under joint administration. On later

motion of the United States Trustee, a trustee was appointed in all the cases.[1]

By the motion at bar, the Trustee seeks to have the estates of the lead-named Debtor, Petters Company, Inc. ("PCI"), and those of all but one of the rest of the Debtors, substantively consolidated.[2]

By this relief, a group of subsidiary-entities would be consolidated into their parent, for all remaining administration in bankruptcy that relates to all of them.

In the detail relevant to that: in Tom Petters's original enterprise structure, PCI functioned both as an ostensibly-operating enterprise and as a holding company for all but one of the remaining Debtors that are subject to this motion. Tom Petters was the sole shareholder of PCI.[3]

In terms of function, the remaining Debtors all served separately as special purpose entities; that is to say, as vehicles for the execution of lending and security transactions with particular "investors"— i.e., lenders—that provided financing for PCI on a sustained basis.[4] Each special purpose entity ("SPE") was identified to a single lender or a single grouping of affiliated lenders. On PCI's application, the financing was given to fund the ostensible purchase and resale of large lots of consumer electronic goods.[5] The pretense was that PCI was actually negotiating and arranging transactions. As a general matter, the resulting financial attributes—the receipt of and the obligation for the credit, the repayment of the loan, and any collateral security related to the underlying diverting transaction—were to repose with an SPE.[6]

1. The trustee then appointed was Douglas A. Kelley. Kelley had also served as receiver over Tom Petters and the others who were subject to the district court's civil proceedings. This court's approval of his appointment as trustee was ultimately affirmed by the Eighth Circuit. *Ritchie Special Credit Invs., Ltd. v. U.S. Trustee*, 620 F.3d 847 (8th Cir. 2010).

2. The excepted Debtor is Petters Group Worldwide, LLC ("PGW"). PGW served as an umbrella holding company for Tom Petters's equity interests in certain businesses, among them the Polaroid Corporation and the Fingerhut Companies. Any further reference to "the PCI-related debtor(s)" will signify the subjects of this motion, i.e., the nine Debtors named in the caption of this order, other than PGW. In no way will such references include PGW. However, the use of the term "PCI-related debtor" is not to be taken as a ruling that PGW was not "related" to the others—an issue that is not before the court in this motion. At the very least, PCI, PGW, and the other Debtors were linked by a common chain of ownership back to Tom Petters; and the Trustee has alleged throughout these cases that on occasion PGW received and then retransferred funds originally generated by PCI's borrowing for its own ostensible business operations. The term "PCI-related

debtor(s)" just signifies a close alignment of PCI with the other Debtors that are subject to this motion, that alignment lying in the organizational and transactional structure of Tom Petters's ostensible business in the retail-goods sector.

3. Debtor Palm Beach Finance Holdings, Inc. ("Palm Beach") was held and controlled by Tom Petters through a separate chain of shareholding-ownership, in which PCI was not a holding company.

4. Most of the parties to litigation in these cases—including the Trustee—persist in terming such lenders "investors" or "note investors." Technically, this nomenclature does not quite fit. Not a bit of these parties' infusion into the Debtors' operations was documented toward an acquisition of capital stock or any other equity interest. It was all documented as lending transactions, with contractual promises to repay and grants of security in ostensible assets of the debtor-entities.

5. These goods were to be flat-screen television sets, electronic game consoles, and the like.

6. In other pleadings in these cases, the term "diverting" has been used to refer to this activity. The term has been defined as the

In reality—as the evidence for this motion and throughout many other legal proceedings has established without controversy—the ostensible business and its transactional structure were virtually all a facade. For a decade or more, there were few true third-party "diverting" transactions behind Tom Petters's requests for outside financing. This whole part of his enterprise structure was run as a huge Ponzi scheme.[7]

At least seven particular lenders (or groups of closely-affiliated lenders) transacted as "investors" with PCI through their own dedicated, PCI-related Debtor-entity. The other two provided "senior lending," i.e., financing, to one of the direct lenders to facilitate its infusions into Tom Petters's operations. The identification between each Debtor–SPE and its associated lender(s) is as follows:

| | |
|---|---|
| PC Funding, LLC ("PC Funding") | Opportunity Finance, LLC, et al (collectively, "Opportunity Finance"); senior lenders, DZ Bank AG Deutsche Zentral–Genossensschaftsbank, Frankfurt am Main ("DZ Bank") and WestLB AG, New York Branch ("WestLB") |
| Thousand Lakes, LLC ("Thousand Lakes") | Lancelot Investment Management, LLC, et al (collectively, "Lancelot") |
| SPF Funding, LLC, f/k/a Petters Finance, LLC ("SPF") | Opportunity Finance; senior lenders, DZ Bank and WestLB |
| PL Ltd., Inc., f/k/a/ Petters Ltd., Inc. ("PL") | Westford Special Situations Master Fund, L.P., Epsilon Global Active Value Fund Ltd., et al (collectively, "Epsilon/Westford") |
| Edge One LLC ("Edge One") | A to Z Investors Fund; Edge Capital, LP; Ark Discovery II, LP |

finding of bulk inventory in desired kinds of goods that is in the possession of parties that do not want it; buying it or contracting for its purchase at a discount; and then quickly reselling it to "big box" retailers for marketing to the public. "Diverting" really is a form of liquidation of under-utilized or excess assets, though the subject property is not necessarily deficient in market value. In light of the reality of Tom Petters's operation, the use of the term is grossly ironic.

7. A Ponzi scheme is a species of fraudulent operation in which third parties are induced to invest with or to lend to the purveyor on the representation that their infusions will go into specific transactions, enterprises, or other investment vehicles that will generate a high return. (Often there is an accompanying representation of limited or no risk.) In actuality, the purveyor repays earlier investors or lenders with money from infusions made by a larger group of later investors or lenders. There is rarely, or never, any use of the funds toward the purposes represented. The shuffle of money is also directed in part to the purveyor's personal uses, often to maintain inflated personal consumption or to keep up the physical facade of a legitimate and successful business operation. The phenomenon is named after Charles Ponzi, a 1920s-era purveyor whose scheme collapsed into a bankruptcy proceeding. One of the controversies in the bankruptcy made it to the United States Supreme Court, *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). *See, in general*, Kathy Bazoian Phelps and Steven Rhodes, *The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes*, § 1.02 at 1–3 to 1–5 (2012).

| | |
|---|---|
| MGC Finance, Inc., f/k/a Petters I, Inc. ("MGC Finance") | Arrowhead Capital Finance, Ltd., et al; Metro Gem Capital, LLC, et al; Arrowhead Capital Management Corp. ("Arrowhead"), servicer |
| PAC Funding, LLC ("PAC Funding") | Acorn Capital Group, LLC, et al ("Acorn") |
| Palm Beach Finance Holdings, Inc., f/k/a/ Petters Capital, Inc. ("Palm Beach") | Palm Beach Finance Partners Holdings, LLC, et al |

## THIS MOTION, IN CONTEXT

Via the motion at bar, the Trustee seeks to have the bankruptcy estates of the PCI-related debtors, including PCI, substantively consolidated. He wants this grant of relief to be made effective as of October 11, 2008, the date on which the first cases in this grouping were commenced.

Five parties in interest or groupings of such parties actively opposed this request. The Committee of Unsecured Creditors for the cases supported it.

All of the objectors were defendants in adversary proceedings commenced by the Trustee in his "clawback" effort in the administration of the bankruptcy estates.[8] They challenged the Trustee on the merits of his case, both his evidentiary showing and the legal merits of granting such relief. They also accused the Trustee of seeking the relief for inappropriate strategic advantage in the avoidance litigation against them.

An evidentiary hearing on the Trustee's motion consumed three long days in the courtroom. The Trustee's opponents presented a united front against ordering any such relief on the general posture of these cases. In addition, each opponent linked to a particular Debtor challenged the consolidation of that Debtor's estate with any other estate.

Requests for substantive consolidation of bankruptcy estates are very rare in this district. Since 1979 there have been no more than a small handful of active contests within that limited number. Binding precedent from the Eighth Circuit Court of Appeals recognizes the availability of substantive consolidation in cases under the Bankruptcy Code of 1978. That precedent is somewhat sparse, one fairly short opinion. Both before and after the issuance of the Eighth Circuit's decision, other circuits have spoken to the remedy in very different ways.

This made the field of argument wide open. The Trustee's opponents urged that the non-precedential appellate case law be considered and applied, on the pitch that

---

8. As non-technical jargon, "clawback" denotes the conduct of mass litigation by a trustee, receiver, or other fiduciary for a failed (often fraudulent) enterprise, in which the recapture of monies paid out to third parties before the failure is sought toward a more equalized distribution of assets to all creditors (or victims) similarly-situated. *See* Andrew Kull, *Common–Law Restitution and the Madoff Liquidation*, 92 B.U. L.Rev. 939, 945 n.23 (2012) ("Within the last few years [the term 'clawback'] has come to be employed by U.S. lawyers as a more vivid way to say 'restitution,' particularly where the claim is one to recover money payments involving fraud or mistake. A claim to recover distributions of fictitious Ponzi profits makes a perfect example of this new usage."). "Clawback" litigation is usually couched as an action under color of state or federal statute, for the avoidance of transfers alleged to have been preferential to the recipient or fraudulent to other creditors, or that conferred unjust enrichment on the transferees. *See, in general, In re Petters Co., Inc.*, 440 B.R. 805, 806 (Bankr. D.Minn.2010).

its elaborations are not inconsistent with the Eighth Circuit's ruling. The Trustee relied on the very brevity of the Eighth Circuit precedent in the first instance; then he accommodated the other approaches in the buildout of his case. The record, then, requires careful consideration of a wide variety of evidence and legal principles alike.

## SUBSTANTIVE CONSOLIDATION, IN GENERAL

The remedy of substantive consolidation has been variously described as "a construct of federal common law, eminat[ing] from equity," *In re Owens Corning*, 419 F.3d 195, 205 (3rd Cir.2005); as available "by virtue of [the] general equitable powers" of the federal courts, *In re Auto–Train Corp., Inc.*, 810 F.2d 270, 276 (D.C.Cir.1987); and as having "no express

statutory basis, but [being] a product of judicial gloss," *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2nd Cir.1988).[9]

The remedy had its antecedents in other principles of general equity jurisprudence-piercing of the corporate veil, "alter ego" liability, and the like. *In re Owens Corning*, 419 F.3d at 205–206. However, in its specific construct, directed to the administration of an estate in a bankruptcy case under federal law, substantive consolidation had its origin in a 1941 decision of the United States Supreme Court, *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941). *Id.* Under this framing, substantive consolidation is uniquely a matter of bankruptcy law, and its application is limited to bankruptcy cases.[10]

---

**9.** For this general discussion, the citation of opinions from any circuit court other than the Eighth is not to be taken as an adoption or endorsement of their specific reasoning or any of the substantive rulings in them. A general understanding of substantive consolidation's origins is shared across the circuits. The effect of its application is also generally recognized. However, the tone, framing, and emphasis vary widely across the analyses, particularly as to the circumstances on which substantive consolidation is warranted.

**10.** As a result, the motion at bar is a core proceeding in the cases of the subject Debtors. For the purposes of jurisdiction and the division of judicial labor within the exercise of federal bankruptcy jurisdiction, this motion is unquestionably a "matter concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A). (And this despite the general cautionary of Eighth Circuit precedent, *In re Cassidy Land and Cattle Co., Inc.*, 836 F.2d 1130, 1132 (8th Cir.1988).) *Cf. In re Bonham*, 229 F.3d 750, 764 (9th Cir.2000) ("The theory of substantive consolidation emanates from the core of bankruptcy jurisprudence...."). As a core proceeding in that specific class, a motion for substantive consolidation is a matter "arising under" the Bankruptcy Code and "arising in" the underlying

bankruptcy case; hence it is under the bankruptcy jurisdiction, 28 U.S.C. § 1334(b). A bankruptcy judge has authority from the face of the statute, 28 U.S.C. § 157(b)(1), to "hear and determine," i.e., to make a final order or to order final judgment, in a core proceeding under 28 U.S.C. § 157(b)(2)(A). (An order disposing of a motion for substantive consolidation is generally recognized as a final order for the purposes of jurisdiction and judicial authority. *In re Bonham*, 229 F.3d at 762.) Finally, because the rule of decision is furnished exclusively by federal bankruptcy law as the federal courts have developed it, there is no constitutional issue over the exercise of that authority. *In re LLS America, LLC*, 2011 WL 4005447 (Bankr.E.D.Wash.2011). *Cf. Stern v. Marshall*, 564 U.S. ——, ——, 131 S.Ct. 2594, 2618, 180 L.Ed.2d 475 (2011) (invalidating grant of authority to bankruptcy judge under 28 U.S.C. § 157(b)(1) to hear and determine proceeding on counterclaim classified as "core" under 28 U.S.C. § 157(b)(2)(C), on ground it was "a state tort action that exists without regard to any bankruptcy proceeding" and grant of full monetary relief demanded by estate-counterclaimant could result in net judgment in favor of bankruptcy estate on state-law claim, hence going beyond disallowance of opponent's claim in administration of estate).

■ All of the circuits that have recognized the remedy articulate its outcome and effects in uniform fashion. When substantive consolidation is ordered for related bankruptcy cases, the respective debtors' estates are merged and their debt structures are combined. *In re Pacific Lumber Co.*, 584 F.3d 229, 249 (5th Cir. 2009); *In re Owens Corning*, 419 F.3d at 206.[11] Within the bankruptcy process, this undoes the consequences of the debtor-entities' pre-petition status as separate legal persons. *In re Owens Corning*, 419 F.3d at 205–206 (classifying substantive consolidation as a remedy of (and for) "corporate disregard," comparable in some aspects of its operation to piercing the corporate veil, "alter ego," and equitable subordination).[12] Pre– (and post-) petition liens against particular assets are preserved, but otherwise the resultant pool of assets is subject to the resultant pool of unsecured claims. *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518. *See also In re Owens Corning*, 419 F.3d at 206 (substantive consolidation "brings all the assets of a group of entities into a single survivor," i.e., the consolidated estate, and "merges liabilities as well"). Inter-company liabilities among the debtors are extinguished. *Eastgroup Properties*, 935 F.2d at 248; *In re Auto–Train Corp., Inc.*, 810 F.2d at 276.

That is the outcome, for the administration of the bankruptcy cases and the one resulting estate, going forward. The effects, however, are distinct. They, too, are recognized in pointed fashion by most of the circuits.

■ Put most succinctly, substantive consolidation "almost invariably redistributes wealth among the creditors of the various entities." *In re Auto–Train Corp., Inc.*, 810 F.2d at 276. *See also Eastgroup Properties*, 935 F.2d at 248. It poses the possibility of "forcing creditors of one debtor to share on a parity with creditors of a less solvent debtor." *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518. As observed by the circuit with the most jaundiced view toward the remedy:

> The bad news for certain creditors is that, instead of looking to assets of the subsidiary with whom they dealt, they now must share those assets with all creditors of all consolidated entities, raising the specter for some of a significant distribution diminution.

*In re Owens Corning*, 419 F.3d at 206.

The judicial reaction to the potential effects is the most salient variable among the published opinions. It is voiced through the forcefulness with which the appellate courts endorse or reject a bankruptcy court's use of the remedy, and the ways they identify and delimit the circumstances in which it is properly applied.

Most of the circuits caution that substantive consolidation is to be used "sparingly." *E.g., In re Owens Corning*, 419 F.3d at 209; *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518. Most also require that the expectations of creditors be recognized at some stage in the analysis—i.e., creditors' *ex ante* reliance on corporate separateness and on having recourse against their specific corporate counterparty and its assets for realization

---

**11.** The *Owens Corning* court noted the way *Sampsell* identified the effect of the early form of the remedy that the Supreme Court recognized there: "... consolidating the estates...." 419 F.3d at 206 (quoting *Sampsell*, 313 U.S. at 219, 61 S.Ct. 904).

**12.** Hence, the origin and nature of the remedy in equity: it overrides the governance that law—here, the law of corporations, contract, and property—would otherwise dictate. *E.g., In re Owens Corning*, 419 F.3d at 205; *Eastgroup Properties v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245, 248 (11th Cir.1991).

on their claims upon default in payment. *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518–519; *In re Auto–Train Corp., Inc.*, 810 F.2d at 276–277; *In re Bonham*, 229 F.3d at 766–767; *In re Pacific Lumber Co.*, 584 F.3d at 250 n. 25; *In re Owens Corning*, 419 F.3d at 210–212.[13] The strength of such suggested recognition varies among the opinions, however, including the way in which it plays into the articulation of standards for the application of the remedy.

Most circuits recognize the overriding tension in cases where the remedy is invoked. It lies between deference to creditors' expectations on the one hand, and the practical difficulties of estate administration in tangled, related bankruptcy cases. The tension becomes stronger the more that cases have histories of complicated interplay in transaction and asset among debtors that have blurred their legal lines of distinction, whether inwardly (between them) or externally (among such debtors and their respective creditors). Such cases often involve accounting records in disarray, when they are not absent in whole or in part. That, in turn, leaves trustees with the burden of lengthy and costly reconstruction of the flow of intermingled funds, cross-payment of intercompany and third-party debt, and inappropriate commingling of other assets. When (as here) related debtor-corporations in Chapter 11 are all under administration by a trustee appointed pursuant to 11 U.S.C. § 1104(a), the trustee has a specific statu-

tory duty to investigate the financial affairs of the debtors, to ascertain and account for the assets that are the property of the estates of the debtors, and to determine the amount, validity, and status in bankruptcy of claims against the estates. 11 U.S.C. § 1106(a)(1) (incorporating specific provisions of 11 U.S.C. § 704(a) (duties of trustee under Chapter 7)).

When a trustee undertakes to do that for multiple related debtor-corporations, the costly pursuit of scant threads of evidence toward dividing assets on the niceties of corporate separateness can significantly diminish returns for creditors, in a literal, in-hand sense. And when creditors themselves were lax in recognizing the separateness of related counterparties and treating them as separate in line with legal formalities, the question is palpable: what interests really are to be served in the bankruptcy process by going through a long and costly exercise of reconstruction under the strict governance of law?

Along a continuum, some courts have put high primacy on deference to creditors' reliance, citing a policy in favor of predictability in contract and the financial markets' dependence on that predictability for their own stability. *Owens Corning* has the strongest statement to this effect, coming close to categorical. 419 F.3d at 210.[14] To lesser impact, the *Augie/Restivo* court saw a creditor's proven reliance as a

---

13. The phrase *ex ante* is used here in the sense of "going forward" from the consideration of separateness and separate means of satisfaction: "based on assumption and prediction; subjective; prospective." Bryan A. Garner, *Garner's Dictionary of Legal Usage* (3d ed. 2011), 337.

14. The Third Circuit's approach resonates with the subset of law-and-economics analysis in which substantive rules allowing readjustment of lending relationships after the fact

are disfavored due to their potential effect on the liquidity within capital markets. 419 F.3d at 211. *Cf. In re Pacific Lumber Co.*, 584 F.3d at 250 n. 25 (voicing "special concern" over the imposition of substantive consolidation in cases involving lending through special purpose entities: "the practice of securitization, a powerful engine for generating capital, will become less useful; and the cost of capital will increase").

significant burden-shifter. 810 F.2d at 276.

At the other end, some courts acknowledge such concerns, but then subordinate them at least in part. None does so expressly.[15] But several opinions from courts in this grouping justify a consolidation by considering the confounding pre-petition entanglement of the debtors' affairs plus the prospect of a costly and difficult accounting and analytic challenge, to outweigh any negative results for particular creditors from readjusting pro rata entitlements into a pooled administration and away from the pre-petition governance of contract. *E.g., In re Bonham,* 229 F.3d at 766–768.[16]

This difference in emphasis matches to the way in which the circuits have described the factors that justify substantive consolidation. In *Owens Corning,* the Third Circuit opined that "most courts slipstream[ ] behind two rationales" that were established in earlier substantive consolidation jurisprudence under the Bankruptcy Code of 1978: that of the Second Circuit in *In re Augie/Restivo,* and that of the D.C. Circuit in *In re Auto–Train.* Subject to a number of variant embellishments in the circuits' opinions, this observation is broadly correct.

The Second Circuit identified the "critical factors" for consideration as:

1. "whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit"; and

2. "whether the affairs of the debtors are so entangled that consolidation will benefit all creditors," by the substantial reduction of administrative expense that otherwise would be incurred to trace and allocate assets and liabilities for a distribution under the governance of nonbankruptcy legal principles.

*In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d at 518. Through a different take, the D.C. Circuit required a proponent to show:

1. "a substantial identity between the entities to be consolidated"; and

2. "that consolidation is necessary to avoid some harm or to realize some benefit," which might focus on the substantial "cost of disentangling the corporate books" but which could take some other form.

*In re Auto–Train Corp.,* 810 F.2d at 278.

In a way, these two standards might be distinguished on their first factor as matters of "melding-in-dealing" versus "melding-in-fact." *Auto–Train's* first consideration is oriented internally, to the subject debtors and the relationships between them alone. Put another way, under *Auto–Train's* framing the melding-oriented first consideration could be satisfied on proof of related debtors' extensive and inappropriate cross-dealing *among themselves,* commingling, and flouting of the formalities of corporate separateness *in their own internal dealings,* alone. If all this had been wholly clandestine, it would not matter. The perceptions, expectations, or contractual rights of outside creditors would be irrelevant to the proponent's prima facie case.

---

**15.** Interestingly, the Ninth Circuit gave lip service to reliance by saying that it was adopting the *Augie/Restivo* test; but then it cited *Auto–Train* to apply what it termed "a presumption that [the creditors] did *not* rely on the separate credit" of the related entities before it. 229 F.3d at 767.

**16.** Significantly, the motion for substantive consolidation in *Bonham* had been made in bankruptcy cases that came out of a failed Ponzi scheme, in which the estates had commenced clawback litigation.

On the other hand, *Augie/Restivo's* first requirement is oriented externally: did third-party creditors deal with and treat the debtor-entities as all part of one, looking to all their resources in deciding to contract with them, understanding the vaguely-bounded whole to be responsible to them on resultant debt?

The D.C. Circuit does recognize the interests of such creditors, by also allowing them to raise their *ex ante* reliance and de facto prejudice in their opposition to consolidation. However, this avenue of objection only opens up "[a]t that time," i.e., after the opponent has given its proof on the two identified elements. *Id.* Under the *Auto–Train* formulation, a movant for substantive consolidation would not have to address or prove the debtors' melding-in-dealing with third parties as part of its prima facie case at all.[17]

The Third Circuit characterized the distinction between the *Augie/Restivo* and *Auto–Train* standards as a sharp one. It used this distinction to stage its own analysis. For that, it "favor[ed]" the "analytic avenues ... of *Augie/Restivo."* *In re Owens Corning,* 419 F.3d at 210. After criticizing *Auto–Train* for erecting a "low bar" in the framing of its second consideration, *Owens Corning* lambastes *Auto–Train* for assigning to the proponent a surrespondent's burden of production that was "a threshold not sufficiently egregious and too imprecise for easy measurement." 419 F.3d at 210. This comes close to a categorical rejection of the availability of substantive consolidation, once an opponent proves up *ex ante* reliance on the identity and repayment ability of its contractual

counterparty: "If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified vis-a'-vis the claims of that creditor." *Id.*

The other appellate opinions do not fall quite so neatly into a bipartite "slipstreaming" as *Owens Corning* alleges. Nonetheless, there is a divide of sorts. It runs between courts on the one hand, that elevate *ex ante* reliance, standing alone, to a complete game-stopper or a decisive burden-shifter; and those on the other, that give greater attention and deference to a trustee's administrative challenges in dealing with a snarl that grew to confounding complexity pre-petition, and that the trustee inherits without having participated in that growth.

The most recent circuit-level pronouncement on substantive consolidation expressly falls into the latter group, the one that is traced from *Auto–Train.* In *Eastgroup,* the Eleventh Circuit adopted the *Auto–Train* test, but also incorporated various principles from other cases. Specifically, it acknowledged that the proponent, in making its *prima facie* case, may frame its argument using various factors from other decisions. 935 F.2d at 249–50. First, it noted that *In re Vecco Const. Industries, Inc.,* 4 B.R. 407, 410 (Bankr.E.D.Va.1980), outlined seven possibly useful factors:

(1) [t]he presence or absence of consolidated financial statements;

(2) [t]he unity of interests and ownership between various corporate entities;

(3) [t]he existence of parent and intercorporate guarantees on loans;

---

17. If the opponent of substantive consolidation did meet its respondent's burden on reliance and prejudice, *Auto–Train* would then shift the burden of production to the proponent: "The court [then] may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh

the harm." 810 F.2d at 276. Clearly, "the harm" would be dilution from the pre-bankruptcy expectancy of direct (and presumably greater) recourse against a single entity's assets. But in this phrasing, this inquiry does not set up creditors' *ex ante* reliance as the exclusive consideration, even then.

(4) [t]he degree of difficulty in segregating and ascertaining individual assets and liabilities;

(5) [t]he existence of transfers of assets without formal observance of corporate formalities;

(6) [t]he commingling of assets and business functions; and

(7) [t]he profitability of consolidation at a single physical location.

935 F.2d at 249 (citations omitted). Then, citing *Pension Benefit Guar. Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1st Cir. 1983), the Eleventh Circuit noted five additional factors that could be considered in some cases:

(1) the parent owning the majority of the subsidiary's stock;

(2) the entities having common officers or directors;

(3) the subsidiary being grossly under-capitalized;

(4) the subsidiary transacting business solely with the parent; and

(5) both entities disregarding the legal requirements of the subsidiary as a separate organization.

935 F.2d at 250. The Eleventh Circuit stressed, however, that the *Vecco* and *Ouimet* factors were only "examples of information that may be useful to courts charged with deciding whether there is a substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit. No single factor is likely to be determinative in the court's inquiry." *Id.* Some factors "may support either element of the prima facie case or both elements—depending on the facts of the particular case." *Id.* at n. 14.

With regard to the objecting party's burden, the Eleventh Circuit drew upon *In re Snider Brothers*, 18 B.R. 230 (Bankr. D.Mass.1982), to espouse what is arguably a reasonably prudent person standard for analyzing a party's reliance on separateness. The Eleventh Circuit noted that

[e]ven if an objecting creditor establishes reliance in fact, it may be estopped from asserting this defense to consolidation where a reasonable creditor in a similar situation would not have relied on the separate credit of one of the entities to be consolidated—that is, "where such a claim would be unreasonable in light of all the facts."

935 F.2d at 249 n. 11 (citing *Snider Bros.*, 18 B.R. at 237, 235, 238).

## THE BINDING PRECEDENT:
### *GILLER*

█ The one unit of binding precedent for the motion at bar falls into the *Auto–Train* line by its substance, if not by express concession. *In re Giller*, 962 F.2d 796 (8th Cir.1992) is not a long opinion. It does not discuss the origins and nature of substantive consolidation. The analysis in *Giller* does not mention *Augie/Restivo* or *Auto–Train*, or examine their different substantive approaches. It does, however, structure an analysis for substantive consolidation around much the same considerations as those opinions do:

Factors to consider when deciding whether substantive consolidation is appropriate include 1) the necessity of consolidation due to the interrelationship among the debtors; 2) whether the benefits of consolidation outweigh the harm to creditors; and 3) prejudice resulting from not consolidating the debtors.

962 F.2d at 799 (citation omitted). After that, the *Giller* court went directly to the propriety of the lower court's decision to grant substantive consolidation. "[P]erceiv[ing] no error in the bankruptcy court's decision to consolidate the Debtors," the Eighth Circuit affirmed. *Id.*

The threshold finding went to a historical fact, "the interrelationship among the debtors." The bankruptcy court had found multiple aspects of melding-in-fact within the debtors' combined operations, which the Eighth Circuit termed "abuses of the corporate form." 962 F.2d at 798–799. These abuses "includ[ed] the potentially fraudulent or preferential transfer of assets." The functionally-related instances were the use of one company's assets to finance the others' operations, but without express, objective terms of repayment; the use of one company's physical facility for all companies' operations without formalities or rent obligations; the pledging of one company's assets for the debts of another; and the uncompensated use of one company's employees in service to another. *Id.*

This holding was the platform for the observation that "there [was] evidence in the record *indicating the necessity* of consolidating the interrelated Debtors." *Id.* (emphasis added). This phrasing is prospective in orientation. After an adjudication of historical fact (the melding-in-fact), it looks forward from the point at which the bankruptcy court was considering substantive consolidation. That wording must be deemed deliberate, and therefore important.

The "evidence," i.e., the case-related *grounds* on which a grant of substantive consolidation was deemed appropriate, was:

Failure to consolidate the Debtors would prejudice the creditors of the insolvent Debtors because the insolvent Debtors could not afford to bring legal actions to recover transferred assets. Finally, the benefits of consolidating the Debtors outweigh the harms because the lawsuits may generate sufficient funds to pay creditors of the insolvent Debtors while still preserving the recovery by the creditors of the solvent Debtor.

*Id.*

And that is the sum of *Giller's* discussion on the merits of the consolidation before it.

Ultimately, *Giller* is significant both for what it *says,* and for what it *allows.* In the case before it, consolidation had been ordered by the bankruptcy court on a combination of circumstances largely articulated in relation to the administrative process in bankruptcy. The Eighth Circuit endorsed the outcome and the basis alike. Its express concern was to promote the economical but full administration of estates toward maximizing recovery for as many creditors as possible.

To the extent that *Giller's* articulated grounds entailed creditors' original expectations, they did so in terms of the return on those expectations that could be had *through* administration in bankruptcy. They did not consider creditors' expectations as they lay at the time of their original transacting with the debtor(s). They neither recognized nor gave primacy to the realization on such expectations that might be had under nonbankruptcy law and process.

*Giller* was decided in 1992. The Eighth Circuit could have affirmatively adopted either of the two rationales behind which most courts have "slipstreamed"—those being *Auto–Train* and *Augie/Restivo.* See *Owens Corning,* 419 F.3d at 207 (noting how courts have generally followed either rationale). Instead, the *Eighth* Circuit prescribed the consideration of the three factors noted above. 962 F.2d at 799.

But despite the brevity of the Eighth Circuit's discussion, it clearly reflects the touchstones of *Auto–Train* and *East-*

group.[18] And, *Giller* draws upon the same or similar authority from lower-court decisions as *Auto–Train* and *Eastgroup* did—all of which was published before *Augie/Restivo* and *Giller* alike.

In turn, where the standards overlap, *Giller's* non-exhaustive list of factors may be informed and supplemented by the *Auto–Train* progeny. This all gives a consistent, appropriate framework for analyzing a motion for substantive consolidation. In contrast, the approaches in *Augie/Restivo* and *Owens Corning* do not coordinate with *Giller's* express articulation. This makes them less relevant to the framework that must be used in light of *Giller's* precedential status—to the extent they are relevant at all.

There are many resonances in the ways *Giller* and the *Auto–Train* line of authority each frame the analysis. Like *Auto–Train*, *Giller* specifically encourages a weighing of the benefits versus the harm. *See In re Affiliated Foods, Inc.*, 249 B.R. 770, 777 (Bankr.W.D.Mo.2000) (noting the similarity). Both cases also place great importance on the interrelatedness of the parties as a major factor for consideration. Meanwhile, consideration of creditor reliance is not at the forefront in either *Auto–Train* or *Giller*. As noted above, in *Auto–Train*, a balancing of benefits versus prejudice can actually override creditor reliance on separateness. 810 F.2d at 276. Under the either/or approaches in *Augie/Restivo* and *Owens Corning*, interrelatedness can guide the result, but it is either adjudged from the creditors' perspective or measured by the degree of commingling. That is a far cry from *Giller* and *Auto–Train*, where an objective analysis of interrelatedness can result in substantive consolidation notwithstanding creditors' perspectives and expectations.

More crucially, as noted earlier, *Giller* and *Auto–Train* share similar roots. Of all sources, *Giller* plucked its three enumerated factors from *In re N.S. Garrott & Sons*, 48 B.R. 13 (Bankr.E.D.Ark.1984). Notably, the list in *N.S. Garrott* is a product of the early case law of the Bankruptcy Code era from trial courts in other circuits, including *Vecco* and *Snider Brothers*. As noted above, the majority of the additional factors in *Eastgroup* came from *Vecco*, and *Auto–Train* principally relied on *Snider Brothers* when it described the proponent's *prima facie* burden. *Eastgroup*, 935 F.2d at 249–50 (citing *Vecco* with approval); *Auto–Train*, 810 F.2d at 276 (citing *Snider Brothers* with approval).[19]

---

**18.** In *In re Bonham*, 229 F.3d at 767, the Ninth Circuit categorized *Giller* as a variant of *Auto–Train*. For now, it is best left to leave such a pronouncement to our circuit court itself.

**19.** *Augie/Restivo* relied instead on a few seminal cases from the Second Circuit, including *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir.1966), and *Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060 (2d Cir.1970). *See Augie/Restivo*, 860 F.2d at 518–19 (citing *Kheel* and *Flora Mir* with approval). In short, *Kheel* and *Flora Mir* emphasized the consideration of creditors' substantive rights, particularly their reliance on separateness, but recognized that substantive consolidation may be appropriate in some cases where the interrelationship of the entities is hopelessly obscured. *See In re Murray Industs., Inc.*, 119 B.R. 820, 828–29 (distinguishing *Kheel* and *Flora Mir* from *Vecco* and a so-called "modern trend"). *Augie/Restivo* placed a great deal of importance on the reliance element in the first possible factor for substantive consolidation, and perhaps an equal amount of importance on the obscurity element for the second possible factor. 860 F.2d at 518. *Owens Corning* went a step further, holding that objecting creditors can defeat substantive consolidation if they are adversely affected and actually relied on separateness. 419 F.3d at 195. Granted, *Auto–Train* did cite *Kheel* and *Flora Mir*, but within the context of its burden-shifting and balancing test. This gave the earlier Second Circuit decisions a meaning different from what has developed out of *Augie/Restivo* and

 In summary, principles from *Auto–Train* and *Eastgroup* logically fit within the *Giller* analysis, and thus should guide it. Creditor reliance may be considered, either at the stage of the necessity consideration (if creditor reliance was actually more on *non*-separateness), or possibly as an affirmative defense to substantive consolidation *after* the proponent has made a showing of interrelatedness. But at that latter stage it should not be an absolute defense. And within the context of *Giller*, the "necessity" of consolidation may still be established notwithstanding the reliance of creditors on the separateness of a particular debtor, if there is a sufficiently strong showing of substantial identity among related debtors via the presence of *Vecco* and *Ouimet* factors (i.e., commingling of assets and liabilities, difficulty in segregating assets and liabilities, unity of interests, etc.) and the equities of impact favor the estate.

### GILLER IN APPLICATION TO THE EVIDENCE AT BAR

### I. Entities and Transactions, Fictive and Actual

### A. Structure, In the Abstract

 Over a decade or more, a complex of structural relationships was created among relevant parties—PCI, the PCI-related debtors, and lenders identified to the PCI-related debtors. Those relationships were created in mind of transactions and transfers that were to take place in the operation of a diverting business based on so-called "purchase order financing." Before treating the minutiae from the welter of evidence in the record, it is necessary to review those relationships in their broad and specific structure, in light of the envisioned transactions that the structure was formed to facilitate—and against what actually transpired in the operation of the Petters scheme. The Trustee's case for substantive consolidation is premised on all this.

At some point, possibly as early as the mid–1990s, Tom Petters established a pretense of an active, large-scale diverting business, that convinced large numbers of parties that contracted with him. He carried forward largely on the pretense rather than a reality, i.e., the ostensible factoring of consumer goods inventory that originally came from a retailer or distributor that did not want it, to a retailer that wanted to acquire it for resale. The entity through which these ostensible transactions were pretensed was PCI.

Tom Petters, acting through the instrumentality of PCI, sought out financing from third-party lenders on the misrepresentation that PCI needed it to acquire the goods. At some point in the growth of the Petters scheme, the matter of presenting an ostensible supply of goods was standardized by enlisting the involvement of two ostensible vendor-entities, which apparently were pretensed as intermediary-factors themselves. These companies were Nationwide International Resources, Inc. (controlled by one Larry Reynolds) and Enchanted Family Buying Company (controlled by one Michael Catain). Nationwide and Enchanted were shells that never owned the assets represented. Their operators were confederates of Tom Petters, in knowing consort with the Ponzi scheme. For years, Reynolds and Catain extracted money for themselves out of lenders' advances of funds, by taking os-

---

*Owens Corning.* 810 F.2d at 276. In turn, even though there is some overlap in the case law, *Auto–Train's* consideration of *Kheel* and *Flora Mir* is more in line with *Giller,* which does not simply emphasize creditor reliance on the one hand versus the potential harm to *all* creditors on the other hand like *Augie/Restivo* and *Owens Corning* do.

tensible commissions on fictive supply transactions.

For most of the loans in the later years of the scheme, an ostensible availability of goods from Nationwide or Enchanted was presented to lenders in connection with PCI's requests for loans. The pretense was that they had the goods ready for the fulfillment of a purchase order from a customer of PCI. (The accompanying implication was, just trust us, don't bother yourself with asking questions. Apparently, not many questions were asked, or verification sought.)

After that, the documentation for a corresponding purchase order from an ostensible customer of PCI was forged in-house by one of Tom Petters's chief confederates, usually Deanna Coleman and sometimes another. This document was used as "proof" of a deal-in-the-making, to induce prospective lenders to make an advance in an amount sufficient to fund the acquisition of the described goods and the costs through to sale, and to give PCI an ostensible profit for its role as diverter.

The alignment of parties, contractual responsibility for repayment, and provision of collateral security for such purchase order financing can vary in actual industry practice. They did among the lenders to the Petters operation, particularly if a given loan featured the presence of the other transactional structure that is directly at issue in this motion, a "bankruptcy-remote entity" as a vehicle for structured finance. (About that, more shortly.)

Over an extended period—possibly up to almost two decades—Tom Petters ob-

tained loans of massive amounts of money on this combination of representation and pretense, to fund the growing scheme that centered around PCI. These funds came from a large number and assortment of sources, for a widely variant number of times and amounts.

Several of his lenders engaged in large numbers of loan transactions with his enterprise, for a more sustained period of time. Members of this cohort were generally well-funded themselves. One grouping of them—the entities affiliated with Opportunity Finance, LLC, identified *supra* at p. 790—obtained much of the capital for their own lending activities with the Petters operation from so-called senior lenders, specifically DZ Bank and WestLB. The terms of Opportunity Finance's credit arrangements with its senior lenders made it accountable in repayment to them in ways linked to its receipt of payment from its own borrowers.[20]

The lenders in this number tended to be more sophisticated and more experienced in complex financial transactions, or at least considered themselves as such. Adopting a structural vehicle that had evolved in the commercial lending sector over the previous two decades, these lenders essayed to protect themselves from the possibility that Tom Petters's enterprise would fail and formal bankruptcy proceedings would result.

That vehicle was to require the formation of a new artificial entity, a "special purpose entity," within the ownership structure of Tom Petters's enterprise but identified exclusively to the particular

---

**20.** The specifics of the Opportunity Finance-senior lender relationship are not material to the matter at bar and hence that is all that need be stated. The broad point, however, is noted in explanation of the senior lenders' prominent place in the dispute at bar. DZ Bank and WestLB are co-defendants in the Trustee's fraudulent-transfer action against Opportunity Finance, under theories of liability that include 11 U.S.C. § 550(a)(2). As a result, they were among the active respondents to this motion, and were accorded standing as such over the Trustee's objection.

lender. Each SPE was to be used exclusively as the vehicle through which lending transactions, rights to payment, and any related collateral security would be documented, committed, and executed for its associated lender.

The express reason for requiring the presence and use of this intermediate entity is revealed in its alternate name in financial-industry jargon, "bankruptcy-remote entity." The thought was that, if contractual privity were strictly segregated through this sole and separate construct, and all flows of credit, inventory, rights to collateral, and/or funds relating to particular lendings were channeled through it, the lender would be immune from liability in avoidance under color of the law of preferential or fraudulent transfer were the main entity-edifice of the Petters operation to formally go into bankruptcy.[21]

Eight (or nine) groupings of the major lenders to Tom Petters's operation required the use of SPEs identified to them as parties within the structure of their lending transactions. These SPEs became debtors in bankruptcy in this case. They and their associated lenders were itemized *supra* at pp. 790–91.

### B. Operation, in Actuality

The description of structure just given is broad. The details of structure varied somewhat among the SPE–Debtors, and the anticipated routing of transactions, money, and property into, within, and out of the structures differed correspondingly. At this point, it is appropriate to describe

how Tom Petters and his confederates perverted that routing to operate and conceal the massive misappropriation of lender-infused cash that they effected under the pretense of diverting merchandise.

Once a fictitious purchase transaction was presented to a lender and the decision was made to loan the fictitious amount represented by the ostensible vendor (usually Nationwide or Enchanted) as its price for the goods, the lender transferred that sum to the SPE's bank account. *E.g.,* "Step 1," Exh. Lakes_004.002.[22] The SPE would then execute a promissory note in favor of the lender.

The SPE would then transfer the fund to the vendor's bank account. *Id.,* "Step 2." Once they were on deposit, the vendor would deduct and retain a fictive commission. *Id.,* "Step 3."

The vendor then transferred the balance to PCI's bank account, which was maintained at M & I Bank. *Id.* The single M & I account received such funds from all of the SPE–Debtors and from other lenders that did not use SPEs for their lending to PCI.

PCI would then transfer funds from the M & I account back to the SPE's account, ostensibly having completed the sale to the retailer. That amount was represented as the price received for the goods from the retailer-customer. *Id.,* "Step 4."

The SPE would use the funds it received from PCI to pay off the lender, in principal plus interest pursuant to the promissory

---

**21.** Among other things, it was thought that if the SPE engaged in no contracting or credit other than with its designated affiliate-debtor, there would not ever be a separate, unsatisfied predicate creditor from which a trustee in bankruptcy could gain standing under 11 U.S.C. § 544(b)(1). As to the issue of having and naming a predicate creditor, *see* Amended Second Memorandum on "Consolidated Issues" Treatment of Motions for Dismissal in Trustee's Litigation [Dkt. No. 2018], 7–15, reported at 495 B.R. 887, 895–901.

**22.** *See also* Exh. Edge_004.0002; Exh. Palm_004.0002; PCI_010.0009 (summary of potential use of funds in such an ostensible transaction.)

note. If any of the funds just received via the transfer from PCI were left, the SPE would transfer that residuum back to PCI, as ostensible "profit" internal to the diverting operation.

As the basic engine of the Ponzi scheme, this process involved commingling at two levels and misappropriation at four points. The diversion of the funds into the scheme and away from the lender-contemplated merchandise purchase was the first misappropriation. Nationwide and Enchanted commingled all funds they received from all of the SPE-related Debtors (and lenders without affiliated SPEs) in one account at each ostensible vendor. The funneling of all SPE-generated and vendor-channeled funds into PCI was a further misappropriation. No SPE's relationship with its lender allowed diversion of funds away from the SPE-vendor-lender nexus. PCI then commingled all receipts from the vendors (and others) in the single, large-balance M & I account. Due to the need to maintain the pretense of a completed, profitable sale to a retailer-customer, the amount of the corresponding transfer of funds to the originating SPE was enhanced from the funds in the M & I account commingled in from other sources. And lastly, the payment to PCI of the residuum after payment to the lender, under the pretense of a wholly-spurious "profit" that was actually funded by stolen money, was a final misappropriation of commingled funds.

This was not the way it was supposed to work, under the SPE-based agreements contemplated by all of the related lenders. But that is how it actually ran. How it should have worked is relevant to the later analysis, and will be detailed then.

The legal status of the SPEs and the legal implications of the differences between the way they were constituted and used have not been called into issue in these cases until now. All of that subject matter is at the very heart of the Trustee's case for substantive consolidation, however.

## II. *Giller's* Factors, on Consideration

### A. Necessity of Consolidation Due to Interrelationship of Debtors

▆▆▆▆ *Giller's* first factor requires two different inquiries. The first is retrospective, i.e., it looks to the state of affairs before the commencement of the bankruptcy process: whether there was an intertwined relationship among debtor-entities that made them functionally one, rather than several. In his case in chief, the Trustee developed a complex record of circumstances that go to this consideration. In part, he relied on the testimony of Theodore Martens, the forensic accountant from the PricewaterhouseCoopers firm which he retained early in these cases to reconstruct the reality behind the pretense of the Petters operation.

#### 1. Interrelatedness of Debtors

#### a. Preliminary Issue: Qualification of Theodore Martens as Expert Witness on Interrelatedness; Reliability of His Opinions

▆▆▆ The Trustee proffered Martens's testimony as that of an expert. To better support the findings on the ultimate issue, it is appropriate to treat this proffer under the terms of Fed.R.Evid. 702, in an overt and formal fashion.[23]

---

**23.** And this should be done despite the fact that no party, and especially the respondents, formally raised an issue before or during the evidentiary hearing as to the qualification of either Martens or their own accountant as an expert, or the reliability or probity of their conclusions. Under Eighth Circuit precedent, this could be deemed a waiver of all objection to the receipt of the testimony in the character of expert opinion. *McKnight v.*

Theodore Martens is a CPA with a certification in financial forensics, a field in which he has long-term accounting experience. He has analyzed inflated financial documentation in other Ponzi scheme cases. He has years of intensive experience in completing other sorts of forensic reconstruction of financial actuality using accounting methods. *See* CV of Theodore Martens, Exh. PCI_004.

Just as in *In re Bonham*, the type of expert needed for the task at bar here is someone "who can take poorly kept, incomplete records, involving commingled funds, and reconstruct the business out of them." 251 B.R. 113, 132 (Bankr.D.Alaska 2000).[24] Martens's background qualifies him to give an expert opinion on the extent to which various entities' funds were commingled, and the flow of those funds into and out of the nodes of commingling.[25]

The Trustee offers Martens's testimony to serve various purposes on *Giller's* first consideration. On the first inquiry, relatedness, the Trustee argues that Petters used the SPEs for the "sole purpose of perpetrating a Ponzi scheme." Trustee's Closing Arg. Brief at 4. For this argument, the Trustee heavily relies on Martens's testimony that the complicated operations

and interaction of PCI and the SPEs fit the definition of a Ponzi scheme, operating as a single unit that funneled funds through PCI. *Id.* Second, the Trustee argues that the SPEs had no independent existence. *Id.* at 7. For this argument, the Trustee partly relies on Martens's testimony—based on PwC's forensic analysis—that PCI and the SPEs completely lacked independent governance and that the SPEs lacked sufficient capitalization. *Id.* at 9–10.

The respondents did not offer expert testimony on the issue of relatedness. More to the point, they did not challenge Marten's conclusions on the high degree of structural and de facto operational interrelatedness among PCI and the SPE–Debtors, by any pointed evidence at all.[26]

Regardless, a few rulings should be made. As to functional interrelatedness, Martens's opinion meets the three-part test for admissibility under the Eighth Circuit's construction of Fed.R.Evid. 702, as it was amended in the wake of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[27] *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir.2001).

---

*Johnson Controls, Inc.*, 36 F.3d 1396, 1407 (8th Cir.1994). However, counsel challenged the substance of their opponents' proffer in post-hearing written argument. A treatment under the formalities of Rule 702 is appropriate, if for no reason other than to further contain the scope of issues that could be raised in the future.

**24.** This is the trial court's decision in the same case that generated the Ninth Circuit's opinion.

**25.** In the post-hearing written argument, the objectors do not appear to dispute Martens's qualification as an expert witness for this purpose.

**26.** The objectors did offer their own accounting-oriented testimony on the issue of burden and expense, similarly offering it as an expert

opinion. That will be addressed with the second substantive aspect of *Giller's* first consideration.

**27.** In *Daubert*, the Supreme Court tasked the trial courts with ensuring that expert testimony is *reliable*, and not just *relevant* in an abstract sense. 509 U.S. at 589–595, 113 S.Ct. 2786. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the court held that this responsibility applies to all expert testimony, not just testimony going to the subject matter of science. The trial court has "broad latitude" in deciding "*how* to determine reliability," as well as in the ultimate determination *on* reliability. *Id.* at 141–142, 119 S.Ct. 1167.

Given the large body of source material from which ultimate facts have to be gleaned, analysis for the existence of patterns and commonalities under the prescriptions of a professional discipline (accounting) is certainly *useful* to a finder of fact on this issue. The record established Martens as *qualified* to draw conclusions about such patterns from his application of the discipline. For the larger part of his initial engagement by the Trustee, Martens went through a lengthy and exacting process to reconstruct and identify the actual passage of money from SPE-affiliated lenders into the Petters edifice and to link the acts of infusion to the later satisfaction of the debts created by them.[28] Given the intensity of that investigation and his prior experience, Martens's opinion as to the failure to observe functional, transaction-specific boundaries between and among PCI and the SPEs is *reliable. Id.*

While Martens's work clearly was done in mind of the work-product's use in litigation, it was also essential to the Trustee's eventual administration of the estate(s) of the Debtors. The accounting work enabled the Trustee to identify both possible creditors' claims and parties from which the recovery of avoidable transfers might be had. Given the sprawling mess the Trustee inherited on the failure of PCI, he had to ascertain whether, and how, the estate(s) could be administered and allocated to claimants on a basis structured from available documentation for transactions and liabilities.

Any conclusion that it could *not* be so administered obviously has an alternate application to substantive consolidation, a remedy which could be obtained only through litigation. However, the use for litigation was not the first or predominant reason to do the analysis. Thus, for application to this motion, Martens's work is not deprived of reliability on the ground of a lack of "independence" on his part, i.e., his opinion on relatedness is not to be rejected as the slanted work of a hired gun. *Cf. Lauzon,* 270 F.3d at 687, 692.

In sum, then, Marten's opinion on functional interrelatedness is admissible.[29]

### b. Analysis: Interrelationship of Debtors

The evidence clearly shows that all of the PCI-related Debtors were interrelated to a degree that meets the first inquiry under *Giller's* first factor.

#### i. Generally

As to the PCI-related Debtors, the Trustee's evidence, as it goes to many of the *Vecco* factors, establishes a substantial *identity,* above and beyond an interrelationship among them. At the forefront, there was a unity of equity interests and ownership among the various Petters entities, a lack of formal observance of corporate formalities by the SPEs, and a huge commingling of assets and business functions in their function as the vehicles for a Ponzi scheme.

---

**28.** This project resulted in the interim report [Dkt. No. 808] that described PwC's reconstruction of the scheme's operation, and identified the "net winners" and "net losers" among major lenders as they stood upon the scheme's collapse in late September, 2008.

**29.** To opposite effect, Martens was not qualified to render a professional opinion on the issue of corporate governance as it bore on relatedness. That was a matter of law as to which an expert opinion was not appropriate

and as to which he had no professional qualifications anyway. *See United States v. Ness,* 665 F.2d 248, 250 (8th Cir.1981). He also admitted in cross-examination that he lacked the expertise to form an opinion on the adequacy of the SPEs' capitalization. However, both of those points are fully subject to fact-finding and ruling on the basic facts which he summarized, and the findings are supported elsewhere in the record.

The testimony of insiders in the Petters organization was particularly instructive. It included testimony from one of Tom Petters's foremost active, knowing confederates in the whole scheme. Deanna Coleman testified that:

Tom Petters and PCI controlled the SPEs. Hrg. Tr. 39:12–14.

The SPEs were not managed independently from PCI. Hrg. Tr. 47:2–10.

The SPEs did not convene meetings of their own boards of directors. Hrg. Tr. 47:24 to 48:4.

The SPEs did not have their own office space, phone lines, employees, fax lines, or email addresses. Hrg. Tr. 48:11–21. When the SPEs incurred costs, PCI paid them. Hrg. Tr. 49:1–6).[30]

During her decade-plus of directly assisting Tom Petters in the purveying of the Ponzi scheme, Coleman did not distinguish between the SPEs and PCI. To her, the transactions ran between PCI and the lenders without regarding the SPE as independent entity-actors. Hrg. Tr. 40:1–9.

On behalf of PCI, she manipulated Sandy Indahl's accounting of the SPEs' books and records by sending Indahl inaccurate spreadsheets of PCI's bank account with M & I and other false source-data. Hrg. Tr. 52:18–22.

She and Tom Petters overtly considered the companies to be operating a "Ponzi scheme." Hrg. Tr. 53:8 to 54:9.

In a similar vein, Sandy Indahl, an accountant-employee of PCI from 2002 to 2008, testified that the SPEs did not engage in any business transactions with third parties independently from PCI. In particular, as she observed in keeping QuickBooks accounting for the SPEs and PCI, all of the SPEs' operating expenses, including professional fees, were booked to and directly paid by PCI. Hrg. Tr. 151:13–16.

In addition, as will be discussed in further detail regarding the "necessity" for substantive consolidation, Martens testified that his forensic analysis revealed that SPE-derived funds were commingled at two stages in the process through which lender infusions were churned through the Petters scheme, as they passed to and through PCI and its main accounts at M & I Bank. Hrg. Tr. 201:16–22. After Nationwide or Enchanted commingled the funds that they received ostensibly as vendors, directly or indirectly from lenders, PCI would commingle them on its receipt from the "vendor." Hrg. Tr. 201:22 to 202:7. According to Martens, "PCI would act as sort of the central depository for all of these funds once they were coming back through from the vendors." Hrg. Tr. 202:8–11.

Finally, as Martens saw in his review of his subjects' structure, the SPEs' governance had no independence whatsoever from PCI; all officers' positions and all of the entities' boards were composed of Tom Petters and no more than two or three persons who were almost invariably directly connected with him in the operation of the whole enterprise.[31] Martens Testimony, Hrg. Tr. 221:2–25, 222:1–21.

### ii. Petters Finance, LLC a/k/a SPF Funding, LLC ("SPF")

For a lengthy period of time, the Petters enterprise structure received loans from a group of entities centered around and owned by members of the Sabes family of Minneapolis. The main vehicle on the

---

**30.** For example, in July 2007, PCI paid PC Funding's $2,500 bill from FWG (accountants retained by PC Funding). PCI_011.

**31.** This point of fact is not contested; there is no evidence in the record to controvert it.

Sabes side was initially known as International Investment Opportunities, LLC ("IIO"); its name was changed to Opportunity Finance, LLC around the turn of the 21st century and afterwards its affiliated entities bore variant names that included the word "Opportunity."[32] At the instance of Sabes family members, the Sabes Family Foundation and the Minneapolis Foundation also "invested in" the Petters enterprise structure.

Opportunity Finance and the two foundations lent to the Petters enterprise structure in a total of 167 transactions evidenced by PCI-executed notes, using SPF as an SPE. Exh. PCI_006.0002. In the aggregate, the three lenders advanced approximately $234,000,000.00 through the instrumentality of SPF, and were repaid nearly $287,000,000.00. Exh. PCI_005.0002.

Petters Finance, LLC (so named on its formation in 2001; renamed to SPF in 2004) was the brainchild of Jon Sabes. Before SPF was formed, IIO had financed PCI directly. Exh. SPF_001.0044; Jon Sabes Testimony, Hrg. Tr. 346:21–24. According to Jon Sabes, he required Tom Petters to form SPF in 2001 in order to "clearly identify which accounts collateralized our loans, as well as we could ensure that the proceeds of our loans went to the specific vendor in such a way that it prevented any commingling of our lender funds in the creation of the assets that collateralized our loans." Hrg. Tr. 352:11–17. Despite any such intention, SPF's structure is significantly interrelated with PCI and other PCI-related entities, and it cannot be considered structurally or operationally separate.

The corporate data sheets provide a snapshot of the interrelatedness among SPF, PCI, and the other PCI-related Debtors. For example, PCI is the 100% owner of SPF; Tom Petters has been the sole governor, President, CEO, and CFO; Deanna Coleman was the Vice President until 2005. There has been no independent director, nor even a provision in SPF's organic documents for one. Exh. SPF_001.0002 to _001.0006. With Tom Petters owning 100% of PCI, the lack of an independent director left SPF without any check against PCI's influence over SPF's actual usage or operations. With reference to the *Vecco* and *Ouimet* factors, the ownership and management structure demonstrates: (1) a unity of interests and ownership between corporate entities; (2) the parent owning the majority (here, all) of the subsidiary's (or affiliate's) stock; (3) and the entities having common officers or directors. *See Eastgroup*, 935 F.2d at 249–50 (listing factors).

As a transactional reflection by way of example, the closing documents of the April 2001 financing deal between IIO and Petters Finance highlight the interrelatedness. Tom Petters was the personal guarantor of the indebtedness and PCI was the corporate guarantor. Exh. SPF_003 OF_SC_00000102–_00000110. Pursuant to a Management Agreement, PCI was named Manager and Petters Finance was named *Agent* to itself, making PCI liable for any losses occurring in the operations of Petters Finance as a result of acts of "fraud, gross negligence or intentional wrongdoing" on the part of PCI. Exh. OF_065_0001–_0002 (subsumed within SPF_003). Provided there was no Event of Default under the financing agreement with IIO, PCI was able to extract money from Petters Finance, either as a management fee, repayment of loans, or an equity distribution from Petters Finance to PCI.

---

**32.** The collective reference to "Opportunity Finance" will be used where references to specific entities are not necessary to convey meaning.

¶ 7 of Email from Simon Root to Tom Petters, Exh. SPF_037.0001. Under *Vecco*, the existence of parent and intercorporate guarantees supports a finding of substantial identity between the parties. 4 B.R. at 410. Here, not only did Tom Petters and PCI guarantee Petters Finance's debts; they also managed Petters Finance with exclusive control and arrogated a right to reap some of Petters Finance's profits to PCI with no real-life check on what they did.

It should be noted that there are some structurally-related aspects of the Credit Agreement that contemplate separateness. For example, under § 5.6, Petters Finance was required to maintain "books, records, financial statements and bank accounts separate from those of any of its Affiliates" and to be "a legal entity separate and distinct from any other entity (including [PCI] and any other Affiliate or Borrower);" and Petters Finance was prohibited from any commingling of "[Petters Finance's] funds or other assets with those of [PCI] or any other Affiliate of [Petters Finance] or any other person or entity." Exh. OF_060_0010–_0011 (subsumed within SPF_003). Also, Petters Finance could not disburse any loan proceeds directly to PCI; instead, funds had to go directly from IIO to Petters Finance, then from Petters Finance to the vendor. Exh. OF_060_0005 (subsumed within SPF_003).

Despite the requirements of the Credit Agreement, commingling of funds was actually countenanced (i.e., *permitted* by IIO/Opportunity Finance) and intentionally practiced on the SPF/PCI side. For example, under Part II(3) of the Assignment Agreement, Petters Finance and PCI were required "to use commercially reasonable efforts to direct Buyers to make payments ... directly to [Petters Finance] for deposit into such account...." Exh. OF_062_0002–_0003 (sub-

sumed within SPF_003). However, if payments were nonetheless made directly to PCI, PCI was required to immediately notify Petters Finance and IIO, to hold the payment in trust for Petters Finance and IIO, and to immediately turn the payment over to Petters Finance. Wires received by PCI had to be transferred to Petters Finance's account "by the next business day." *Id.* In practice, every single note from Petters Finance to Opportunity Finance was paid by funds that flowed through PCI's M & I account, which means that every single dollar was commingled. Testimony of Jon Sabes, Hrg. Tr. 419:13–17. Under *Vecco*, the commingling of assets and business functions is a significant factor evidencing an identity between entities. 4 B.R. at 410. Here, both PCI and Petters Finance were to *try* to direct buyers to make payments directly to Petters Finance's account; but in consort these entities also set up a system that allowed for commingling and they clearly relied upon it in operation (however temporary the actual commingling turned out to be). SPF and the Sabeses never required or got the creation of a mechanism to prevent commingling.

Finally, there is the important fact that the Sabeses were unable to get the PCI side to provide a non-consolidation opinion as to SPF at the inception. This actually shows that Petters Finance was not even established with separateness in mind. In May 2001, *after* the April 2001 Petters Finance/IIO contractual arrangement closed, Jon Sabes asked Fredrikson & Byron (then representing PCI and Tom Petters) to provide an opinion with respect to Petters Finance that it would not be subject to consolidation if PCI filed for bankruptcy. Exh. SPF_038.0003. Simon Root of the firm told Sabes that they had not structured Petters Finance with non-consolidation in mind. *Id.* In deposition, Heather Thayer, an in-house attorney for

the Petters entities, reiterated and supported Root's view. Thayer Depo., 132.[33]

Sabes told Root that he was "surprised by [Root's] response in that I thought we did create the structure with this idea in mind, e.g. *isolating credit risk.*" Exh. SPF_038.0003 (emphasis added). Root then explained to Sabes that he understood Petters Finance to have been created for the purpose of isolating IIO as a creditor, but without any consideration as to whether Petters Finance was structured in such a way as to avoid substantive consolidation in the event that PCI later filed for bankruptcy. Exh. SPF_038.0003.

In fact, Root and Thayer believed that it would be difficult to justify and subscribe to a non-consolidation opinion in light of various "unusual aspects" of the deal, such as the assignment agreement likely not meeting the very high standards of non-consolidation, the existence of the guarantees, and the lack of an independent director. Thayer Depo., 132; Exh. SPF_038.0001–038.0002. According to Root, non-consolidation only came up as a separate "goal" *after* the parties closed the credit agreement signing. Exh. SPF_038.0002.[34] In turn, while Jon Sabes

might have thought about the bankruptcy-remoteness of Petters Finance, bankruptcy-remoteness clearly was not a prerequisite or even a goal as the structure of Petters Finance and IIO's relationship was finalized. The result eventuated: the end-product was not worthy of a non-consolidation opinion.

### iii. PC Funding, LLC ("PCF")

Opportunity Finance made a separate and large number of loans into the Petters operation using a second SPE, PC Funding, LLC. Opportunity Finance lent through PCF in a total of 546 note-evidenced transactions. Exh. PCI_006.0002. In the aggregate, Opportunity Finance advanced $1,949,456,003.00 through SPF, and received $2,039,994,706.00 in repayment. Exh. PCI 005.0002.

Formed in December 2001, PCF's structure is slightly different from SPF. As with SPF, PCI was PCF's sole owner; Tom Petters was the sole governor, President, CEO, and CFO; and Deanna Coleman was the Vice President. Exh. PCF_001.0005. However, there was an independent director at all relevant times, at least nominally. *Id.*[35] Further, neither

---

**33.** Exerpts from the transcript of Thayer's deposition were received into the record by stipulation, in lieu of in-court testimony.

**34.** In a January 15, 2001 memorandum, copied to Root and others, Jon Sabes outlined his plan to create a special purpose entity (then planned to be called Petters Capital, Inc.), noting that "some thought should be given to making PCA bankruptcy remote at this time." Exh. SPF_044.0005. Based on the Root emails and Thayer's deposition testimony, however, it seems as though bankruptcy-remoteness never actually materialized as a "thought" subjected to discussion between the sides, until after closing.

**35.** An independent director signed written actions of the board of PC Funding. PCF_001.0032; PCF_001.0035; PCF_001.0038; PCF_001.0113. However, re-

gardless of the signature, the testimony suggests that the independent director was not involved in decision-making. For example, as Deanna Coleman testified, the SPEs did not convene meetings of the board. Coleman Testimony, Hrg. Tr. 47:24 to 48:4. Further, the independent director was regarded within both the Petters operation and Opportunity Finance as more of a formality for the appearance of separateness. This is evident from Heather Thayer's December 2001 email to Jon Sabes, where she referred to the nominally-independent director as a "Rent–a–Director." Thayer Depo., Exh. 11; Thayer Depo., 43. In the end, as Coleman testified, Tom Petters and PCI controlled the way the SPEs operated, both *de facto* and *de jure.* Hrg. Tr. 39:12–14.

Tom Petters nor PCI provided any guarantees to Opportunity Finance.[36]

The presence of an independent director and the lack of guarantees were Jon Sabes's attempt to overcome the faults that existed with SPF. Other points going to separateness include § 9(k) of the LLC Agreement, which contains various "Separateness Covenants." These provisions were aimed at preventing PCF from commingling assets; and requiring PCF to maintain separate books, to pay its own liabilities out of its own funds, to observe corporate formalities, to maintain separate office space, and more. Exh. PCF_001.0017–_001.0018. But notwithstanding efforts by Opportunity Finance to induce the creation of a "separate" entity, there is still a great amount of evidence to establish interrelatedness.

First, PCF was substantially dependent upon PCI to stay in business, *de facto.* This dependence was noted in an audit planning worksheet by BPK & Z for the years 2002 and 2003. *See* Exh. PCF_106.0047 (noting "dependence on parent company to stay in business" as a condition that caused serious doubt about PCF's ability to continue as a going concern). To alleviate BPK & Z's doubts regarding PCF's going-concern ability, PCI re-characterized a debt obligation (accounts payable) owed by PCF to PCI as "contributed capital," crediting it to PCI's membership equity in PCF. Independent Auditor's Report of PC Funding ¶ 6, Exh. OF_008_0010. This re-characterization by PCI to preserve an abstract basis on paper to classify PCF as a financially-viable going concern illustrates PCF's strong dependence on PCI, as well as the broader interrelationship between PCI and PCF.[37]

Second, Tom Petters could—and eventually did—utilize his control over other entities in his operation, and his access to their resources, to benefit PCF. For example, when PCF defaulted on its notes to Opportunity Finance in 2008, Bob Sabes demanded additional collateral from Tom Petters. Exh. PCF_146. In response, Tom Petters told Sabes that he was going to pledge "his" stock in the Fingerhut Companies. These shares actually were held in title by another entity that he controlled. Exh. PCF_147.[38] Interesting-

---

**36.** Actually, while no guarantees are in the record, it appears that DZ Bank required that any existing guarantees be reduced to below 10 percent of the loan portfolio in order to be considered a true sale. Francine Farragher Depo., 22:21 to 23:13, Exh. PCI 034A. To the extent that guarantees existed, they appear to have been considerably smaller for the PCF facility.

**37.** More evidence of interrelatedness lies in the fact that PCI paid PCF's operating expenses. *See* 2007 Audit of PC Funding by FWG, OF_047_0022 ("[PCI] pays all the operating expenses on behalf of PC Funding, L.L.C. The operating expenses amount to $5,319 and $5,919 in 2006 and 2005, respectively.") This flies right in the face of one of the indicia of separateness that the Mayer Brown law firm of Chicago assumed PCF and PCI would maintain, in opining on the likelihood of substantive consolidation. *See* OF_010_0008–10_0010. However, § 3.2 of the Servicer Agreement between PCF and PCI required *PCF* to *reimburse* PCI for all costs or expenses that PCI paid or incurred in connection with the performance of its Servicer duties. PCF_002.0072. Accounting fees and other PCF operational expenses logically would be reimbursable costs that fall under § 3.2. *Id.* For example, under § 1.1, a catchall duty of PCI was to "provid[e] such other services as may be reasonably required to operate the business of PC Funding." Exh. PCF_002.0070. The provision for a reimbursement mechanism lessens the weight to be given to the fact that PCI actually paid PCF's operating and accounting expenses. However, there does not appear to be a line item in any of the financial statements in the record that actually memorializes an act by PCF to reimburse PCI.

**38.** That entity likely was PGW, the Petters holding company for equity interests in busi-

ly, it seems that PCF's own formation documents allowed Petters to do so. Section 8 of PCF's LLC Agreement provided that all Officers of PCF, one of which was Tom Petters, "shall have and exercise all powers necessary, convenient or incidental to accomplish [PCF's] purposes as set forth in *Section 7* " of the LLC Agreement, including carrying out all obligations under the agreements and notes. Exh. PCF_001.0014–_001.0015. The Written Action by the PCF board provides for this also. Exh. PCF_001.0038.

So, it appears that Tom Petters was broadly empowered to step in and help PCF meet its debt obligations, to prevent PCF's failure as a going concern. Meanwhile, his ownership in, and power over, other entities provided him the de facto means to do so, whether his resort to them was lawful or not.

Third, as with SPF, the active and large-scale commingling of funds chargeable to PCF through the conduit of PCI was actually contemplated and practiced by both lender and borrower. Under Section II(C) of the December 2001 Sale Agreement between PCI and PCF, PCI was required to direct account obligors to make payments "directly" to PCF's account. Exh. PCF_1.0044. In the event PCI received payments, PCI was required to hold the funds in trust and immediately turn them over to PCF; in the event that PCI received wired payments, PCI was required to wire the payment to PCF's account by the next business day. *Id.* Section 2.2(b) of the December 2001 PCF–Opportunity Finance Credit Agreement reiterated how payments would flow in the event that PCI received payments from the Buyer. In practice, as was the case with funds chargeable to SPF, every single note from

ness entities outside his ostensible diverting business.

PCF to Opportunity Finance was paid by funds that flowed through PCI's M & I account. This means that every single dollar received by Opportunity Finance on PCF's account was commingled at some point in time. Testimony of Jon Sabes, Hrg. Tr. 419:18–24.

#### iv. PL Ltd., Inc. f/k/a Petters Ltd., Inc. ("PL")[39]

Tom Petters formed Petters Ltd., Inc. in 1995, but the entity did not function as a lending-related SPE until 2001.

In 2001, the Epsilon/Westford entities began lending to the Petters enterprise structure, and Petters Ltd., Inc. was re-purposed for the administration of that lending relationship. Epsilon/Westford lent using Petters Ltd., Inc./PL in a total of about 151 note-evidenced transactions. Exh. PCI_006.0002. In the aggregate, Epsilon/Westford advanced $2,471,580,000.00 using PL as an SPE, and was repaid nearly $2,795,000,000.00. Exh. PCI_006.0002. The Epsilon/Westford indebtedness was fully paid (100% of principal advances plus approximately $324,000,000.00) by March, 2007.

In March, 2008, PCI repurposed PL a second time, to serve as SPE for a new lending relationship with Elistone Fund. During 2008 Elistone lent into the Petters operation in a total of 21 note-evidenced transactions. Exh. PCI_006.0002. In the aggregate, Elistone advanced $60,397,000.00 through PL as the SPE. By the time of the scheme's collapse, it had been repaid nearly $27,000,000.00 in principal plus approximately $826,000.00 in interest. This left Elistone unsatisfied to the extent of nearly $34,000,000.00 in principal.

**39.** Petters Ltd., Inc. changed its name to PL Ltd., Inc. in 2004. Articles of Amendment, Exh. PL_EP_001.0014.

From at least 2001 to early 2008, PL was substantially interrelated with PCI. For most of PL's existence, Tom Petters owned 100% of PL's shares in his individual right and was PL's Director, CEO, and CFO. Exh. PL_EP_001.0006–0007. Deanna Coleman was the only other member of PL's board, in the officer-capacity of Vice President. Exh. PL_EP_001.0007. During Epsilon's tenure as a lender through PL (2001–2005), Tom Petters and PCI provided various guarantees to Epsilon. Tom Petters provided personal guarantees for the PL–Epsilon Loan Agreements of April 19, 2001 (PL_EP_002.0023), April 30, 2001 (PL_EP_003.0078), and May 25, 2001 (PL_EP_004.0038). Tom Petters *and* PCI provided the personal and corporate guarantees for the Loan Agreements of July 26, 2001 (PL_EP_005), July 31, 2001 (PL_EP_006), and August 31, 2001 (PL_EP_008), and for the Master Loan Agreement of October 31, 2001 (PL_EP_009).

After Epsilon's exit from the debt-structure of the Petters operation, PL underwent at least three changes. On February 28, 2008, PL amended its Articles and Bylaws, and PL's board approved the appointment of an independent director, Bernard Angelo, pursuant to the company's Amended Articles and Bylaws. Exh. PL_EP_001.0009–0013; Exh. PL_EP_001.0036. On April 9, 2008, Tom Petters transferred all of his PL shares to PCI, making PCI the equity-owner of PL. Exh. PL_EP_001.0034. Even so, certain *Vecco* and *Ouimet* factors (e.g., unity of ownership among a tight group of entities, parent owning at least a majority of stock, common officers among entities) continued in the PCI/PL structure.

More crucially, bankruptcy-remoteness was not contemplated or intended as an incident of PL's structuring. According to Heather Thayer, bankruptcy-remoteness barely came up in conversations with the lenders and was "fairly quickly dropped" because "that wasn't what we were attempting with these [transactions]." Thayer Depo., 154. Instead, according to Thayer, the parties were consciously working to "have an entity that the lenders could do a blanket [UCC] filing on, because [they] couldn't have blanket filings against Petters Company, Inc. because there were too many lenders and the priority issues became a problem." Thayer Depo., 155.

### v. Metro Gem Capital Finance, Inc f/k/a Petters I, Inc. ("MGC Finance")

A Minnesota-based group of entities headed by Arrowhead Capital Management Corp. began lending to PCI in mid–2001. Petters I, Inc. was formed at that time to be the SPE-vehicle for this relationship. It changed its name to MGC Finance, Inc. in early 2005. The Arrowhead Capital group lent to the Petters operation through MGC Finance in a total of 1,240 note-evidenced transactions. Exh. PCI_006.0002. This involved a total of $4,600,102,428.00 in advances, and a repayment of $4,705,370,279.00 in principal and interest.

MGC Finance was not separate from PCI. At all times, PCI owned 100% of MGC Finance's shares. Exh. MGC_001.0002–_001.0008. Tom Petters was always President, and Deanna Coleman was Vice President until the FBI raid. *Id.* MGC Finance's board included Tom Petters, Thomas Hay (an attorney working within the Petters enterprise structure), and an independent director. *Id.* There is no evidence in the record that an actual board meeting was ever convened. This suggests that the independent director played no role in the decision-making processes. Coleman Testimony, Hrg. Tr. 47:24 to 48:4. Further,

even though Fredrikson & Byron (the outside counsel for the Petters organization) supplied the lender and borrower parties with a non-consolidation opinion on July 19, 2001, Exh. MGC_045, actions by MGC Finance and PCI undermined that opinion only one week later. Exh. MGC_046. Specifically, *without* formal corporate authorization, the parties "entered into a transaction in which approximately half of the purchase price [on an ostensible diverting transaction] was loaned to Petters Company, Inc. on an unsecured basis. PCI, in turn, made a capital contribution to Petters I in that amount to enable Petters I to purchase the inventory." Exh. MGC_046.

Under *Vecco,* such action constituted a transfer of substantial assets without formal observance of corporate formalities. 4 B.R. at 410. Under *Ouimet,* such action constituted a disregard of the legal obligation to maintain the subsidiary as a separate organization in operations, as was specifically contemplated by the SPE-principal relationship. 711 F.2d at 1093. Finally, the funds flowed through PCI's account in a commingling, even though such was contrary to what Petters originally agreed. Thayer Depo., 101, 103; Thayer Depo. Exh. 29.

### vi. Thousand Lakes, LLC

In late 2002, the Petters operation began borrowing from a Chicago-based group of entities for which Lancelot Investment Management, LLC was the investment manager. Thousand Lakes, LLC was formed at that time to be the SPE through which the Lancelot group's lending was to be administered. After that, 496 different note-evidenced loan transactions were done using Thousand Lakes, for total advances of $8,792,413,871.00. The Lancelot group received repayment of a total of $8,027,787,980.00 in principal and interest. The outstanding balance on 73 open notes was $1,548,462,485.00.[40]

Thousand Lakes is substantially interrelated with PCI. From 2002 to 2005, Tom Petters owned 99% of Thousand Lakes, while his confederate Robert White owned the remaining 1%. Tom Petters and White were the only officers. The Board of Managers consisted of Tom Petters, Bob White, and one independent manager named Orlanda Figueroa. Exh. Lakes_001.0001–_001.0002. From October 2005 to September 2008, PCI owned 100%, and Deanna Coleman replaced Bob White as manager and officer.

Not only did PCI or the officers of PCI own and functionally have control over Thousand Lakes, but the exercise of that ownership and control ultimately enhanced a clear unity of interests among it and various other corporate entities within the Petters enterprise structure. For example, in January 2005, Thousand Lakes and PCI amended the initial Thousand Lakes LLC Agreement, afer that to list three purposes of Thousand Lakes: (1) to acquire and sell goods, and to borrow in order to finance such activities; (2) to "guaranty the obligations of uBid, Inc. or such other affiliates of Petters Group Worldwide" for the benefit of Lancelot ("Affiliate Guaranty"); and "to borrow money to loan to Petters Capital, LLC" ("Affiliate Loan"). Amendment No. 2 ¶ 1, Exh. Lakes_001.0034. The amendment also required Thousand Lakes "to operate in

---

**40.** The shortfall of *a billion and a half dollars* made the Lancelot group the largest "net loser" hit by the collapse of the Petters scheme. It was no wonder that bankruptcy filings in the Northern District of Illinois for the entities in the Lancelot group followed the commencement of these cases. The trustee for the Lancelot entities has been a participant in proceedings here.

such a manner that, without taking into account the Affiliate Guaranty or the Affiliate Loan, it should not be substantively consolidated in the bankruptcy estate of any of the Members," etc. *Id.* ¶ 2.

Notwithstanding the latter provision, the Affiliate Guaranty and the Affiliate Loan are prime examples of the coincidence and melding of interests among the affected Petters entities. Their structuring reflects how Tom Petters was able to use his position within each to accrete multiple levels of intercompany loans and guarantees. Another example of such activity is a September 2008 amendment whereby PCI, as sole member of Thousand Lakes, pledged 100% of the Thousand Lakes shares to Ritchie Capital Management. At the time, Ritchie Capital Management was not a creditor of Thousand Lakes. Amendment No. 3 ¶ 4, Exh. Lakes_001.0038_001.0039.

Finally, and again as with the other SPEs, funds identified to lending from the Lancelot entities were commingled at PCI's M & I account long before the corresponding debt was repaid out of the Ponzi scheme. Exh. Lakes_004; Lakes_005; Lakes_006.

### vii. Edge One, LLC

In 2007, a grouping of lenders consisting of AtoZ Investors Fund, LP; Edge One Capital, LP; and Ark Discovery II, LP, began advancing funds into the Petters operation. These parties used the newly-formed Edge One, LLC as the SPE-vehicle for their lending. Over the ensuing year, the Edge One group made a total of 29 note-evidenced loans, for a total advance of $159,010,000.00. The Edge One parties were repaid $36,302,900.00 in principal and interest before the collapse, leav-

ing $122,707,100.00 in outstanding principal.

Edge One is substantially interrelated with PCI. Formed as Edge One in 2007, PCI has always owned 100% of its shares. Tom Petters was the President, CEO, and *sole* manager of the board. Exh. Edge_001.0010–_001.0011. PCI also provided a corporate guaranty in favor of the lender under the notes, Edge One Capital f/k/a AtoZ Investors Fund. Exh. Edge_002.0052. Finally, as with other SPE-associated lenders, funds received in borrowing from this group of lenders were commingled in PCI's M & I account. Edge_004.[41]

### viii. PAC Funding, LLC ("PAC")

Acorn Capital Group, LLC first became involved with the Petters operation in 2001, by loans to a Petters-owned entity called RedtagBiz, Inc. It began lending into PCI's operation in mid–2002. In 2004, PAC was formed as the SPE-vehicle for Acorn Capital's ongoing lending relationship with the Petters operation, opening a line of credit. In the course of the relationship, Acorn made advances to PCI or PAC evidenced by a total of 709 notes. PCI_006.0002. The total of principal advanced under these notes was $2,525,082,443.00. PAC was repaid a total of $2,386,737,637.00 in principal and interest, leaving an outstanding balance of $267,887,980.00 in principal and interest. PCI_006.0002.

PAC Funding was substantially interrelated with PCI. At all relevant times, PCI owned 100% of the company equity, and Tom Petters was the President, Chief Manager, CFO, and *sole* director on the board. Tom Petters provided a personal guaranty on behalf of PAC Funding and in

---

41. Among all SPE-associated creditors, the Edge One group was the only one that had not itself been forced into bankruptcy or liqui-
dation and yet did not oppose the motion at bar.

favor of Acorn Capital. Exh. PAC_002.0040. Later, in July 2007, PCI, PAC Funding, and Petters Aviation provided an "unlimited guaranty" in favor of Acorn for Acorn's loans to *Petters Aircraft*, a different entity in Tom Petters's overall enterprise structure. Exh. PAC_003.0026.

Petters used his power over PAC Funding to cause it to guarantee the obligations of Zink Imaging, another Petters affiliate, to Acorn Capital Group. Exh. PAC_001.0025. In February 2008, Petters also used his control to subordinate the security interests that various Petters entities (PCI, Petters Company, LLC, Petters Capital, LLC, and Thomas Petters, Inc.) held in certain assets held by companies in the Polaroid enterprise structure, to PAC Funding's and Acorn Capital's interests in those assets. Exh. PAC_003.0036. Notably, the subordination agreement was entered into pursuant to a February 2008 forbearance agreement among PAC Funding, Tom Petters, and Acorn Capital. Exh. PAC_003.0042. In May 2008, section 2(e) of the Fifth Amendment to the Credit Agreement between PAC Funding and Acorn Capital clearly affected the rights and authority of *Polaroid* despite it not being a party to the agreement. Exh. PAC_003.0057. Finally, Acorn Capital transferred the note amount directly to *PCI's* account because PAC Funding did not even have its own bank account. Martens Testimony, Hrg. Tr. 229:3–5; *see* Exh. PAC_005.0002 (showing step 1 as a transfer between Acorn Capital and PCI).[42]

### ix. Palm Beach Finance Holdings, Inc., f/k/a Petters Capital, Inc. ("Palm Beach")

Petters Capital, Inc. was formed in 1998 to hold a credit facility from another lender.[43] In late 2002, it was repurposed to be the SPE for a new lending relationship between a group of lenders headed up by Palm Beach Finance Partners, LP. As if to deliberately make things confusing, Tom Petters then renamed Petters Capital, Inc. to Palm Beach Finance Holdings, Inc. After that, the Palm Beach lenders advanced funds to the Petters operation in a total of 2,449 note-evidenced transactions. Exh. PCI_006.0002. They infused a total of $8,687,681,815.00 into the Petters operation and were repaid a total of $8,045,725,891.00 in principal and interest. Exh. PCI_006.0002.[44]

Palm Beach is substantially interrelated with PCI. At all relevant times, Tom Petters held 100% of its ownership and was the *sole* director of its board. Exh. Palm_001.0001–_001.0003. Notably, Palm Beach did not have any officers at all. *Id.* The stock roster for Palm Beach reflects that Tom Petters eventually transferred 100% of his shares to PCI. Exh. Palm_001.0013.

In November 2002, PCI and Palm Beach entered into an Administrative Support Agreement, in which PCI agreed to keep Palm Beach's books and records, to pay

---

**42.** PAC Funding and Acorn did have a lockbox account, but that was only for funds ostensibly paid in by retailer-purchasers of goods through Petters. Exh. PAC_002.0046.

**43.** That is, the General Electric Credit Corporation, which later exited its lending relationship with the Petters operation. GECC was sued by the Trustee as part of the avoidance litigation effort and has since settled all claims against it.

**44.** As with the Lancelot lenders, the outstanding and unsatisfied principal balance—again, over *one billion dollars*—propelled the Palm Beach lenders into liquidation in bankruptcy. Their cases are pending in the Southern District of Florida. The trustee of their estates has participated in various proceedings in these cases.

Palm Beach's expenses, to make Palm Beach's equity distributions, and even to carry out Palm Beach's banking activities. Exh. Palm_002.0036. In other words, PCI controlled Palm Beach, under contract and de facto. In Article VIII ("Bankruptcy Remote Protections") of a July 2004 Sales and Servicing Agreement between PCI and Palm Beach, section 8.1 required Palm Beach's board to have one independent director as "set forth in [Palm Beach's] articles of incorporation." Exh. Palm_003.0060. However, Palm Beach's Articles of Incorporation provided for only one director on the board: Tom Petters. Exh. Palm_001.0007. Thus, Palm Beach's own organic documents conflicted as to the lawfulness of having even one nominally-independent voice in governance. They conclusively memorialize a failure to be separate from Tom Petters. And as with the administration of indebtedness to the other SPEs, all funds from the Palm Beach lenders' advances were commingled by passing through PCI's M & I account. Exh. Palm_004; Exh. Palm_005.

### 2. Resultant Necessity of Consolidation

#### a. In Furtherance of Administration in Bankruptcy

##### i. Generally

The second inquiry for *Giller's* first factor is prospective in orientation; it looks forward from a point *after* the initiation of bankruptcy. In doing so, *Giller* assigns high priority to the administrative process in bankruptcy, in its functional sense—i.e., the recovery of as much net value as possible for the satisfaction of creditors' claims.

■■■ As such, the second inquiry mainly looks to whether substantive consolidation will simplify the administration.[45]

This issue is especially salient where a high degree of commingling and intercompany transfers was among the abuses of the corporate form. Where tracing through such a history would involve large complications, substantive consolidation could greatly streamline the arithmetic (and the geometry) entailed in estate administration. That would be even more so in a case involving an incomplete, confusing, or facially unreliable documentary record from which the tracing would be made.

This streamlining would flow from three of the consequences of substantive consolidation: making intercompany transfers and claims irrelevant to administration; taking related, now-consolidated debtors out of the potential population of claimants against the estate; and making the claims of all "external" creditors allowable against a single pool of assets post-consolidation. Before consolidation, under the assumption of corporate separateness, there would have been a multiple layering of pro rata distribution—a complicated map for the tracing of distribution going forward. Upon a consolidation, that is reduced down to one level, subject internally to statutory priorities.

Thus, where a pre-petition breakdown of separate identity was so extensive that it approached a melding, substantive consolidation would be merited when it would make a trustee's job significantly simpler, and where the administrative expense entailed in performing that job would be materially reduced.

The Trustee approached this aspect of the first consideration in a functional sense. He argues that finalizing a comprehensive roster of claimants entitled to a distribution would be vastly simplified

---

**45.** And this, of course, is examined only after there is sufficiently strong evidence of a pre-bankruptcy melding-in-fact of debtor entities, i.e., the outcome on the first inquiry shows a past reality that belies the legal formality of corporate separateness.

were substantive consolidation ordered now. And, he maintains, the estate's administrative expenses would be reduced by ten million dollars in accounting costs alone.

His evidence to prove this, as a matter of fact, was the testimony of Theodore Martens. The respondents countered with the testimony of another accountant, Paul Charnetzki.[46]

### ii. Preliminary Issue: Reliability, Qualification, and Reliability as to Testimony Offered as Expert on Accounting–Related Costs of Administration

 As before, though it is not technically required because none of the parties filed *Daubert* objections earlier, a *Daubert*-style analysis of the Trustee's expert is necessary here for fact-finding. And, of course, the objectors' proffer of another accountant's opinion to counter that requires the two-stage analysis to be done for his testimony.

### Theodore Martens (Trustee)

When called by the Trustee, Martens testified that the true state of the assets and liabilities of the PCI-related Debtors' estates is massively obscured by the churn of commingling over the duration of the scheme, and hence would be prohibitively expensive to reconcile if that could be responsibly and accurately done. Hrg. Tr. 267–273. Opportunity Finance and the Epsilon/Westford parties attack the reliability of this opinion.[47] They argue that Martens's conclusions are flawed because

they are the result of an unreliable methodology.[48]

This argument reflects the difference in the way the parties framed a larger issue, as well as their dispute over the admissibility and evidentiary use of the proffered opinions. The contest between the two sides' accountant-witnesses is couched in terms of the methodologies they respectively used. However, in the end the probity of their respective opinions really depends on something different: the bankruptcy estate's *needs* in the way of forensic accounting service, to address the imperatives of the Trustee's duties for a specific phase of his administration. The service required to fulfill those duties is dictated in nature and proportion by all of the impediments that faced him when he undertook the administration.

For the second aspect of *Giller's* first consideration, Martens was tasked with determining what accounting would have to be done to reconcile the PCI-related Debtors' financial statements to reflect as closely as possible the actual obligations and rights cross-running among all of those entities as they stood in bankruptcy, but as created by their usage in the Ponzi scheme. The adjustment was to be made in light of the systemic misappropriation of funds lent into the Petters operation, away from the ostensible purposes for which they were lent, and their wrongful application to the support of the scheme.

Martens was to make this assessment on the assumption that PCI and all of the SPEs were to be treated as separate legal entities, each to be attributed with its own

---

**46.** Specifically, Epsilon/Westford called Charnetzki as their witness; but Opportunity Finance overtly relied on his testimony, and the other respondents tacitly so.

**47.** It is not contested that Martens is expert-*qualified* to give an opinion on the extent and cost of future accounting tasks that still need

to be performed, and how the scope of tasks would be affected by substantive consolidation

**48.** The Epsilon/Westford parties cite *Daubert* and Rule 702 in their argument. Epsilon/Westford's Closing Arg. Brief at 40.

designated assets and liabilities in consequence of all past acts done through it and in its right. Then he was to opine on the likelihood that such a reconstruction would be accurate, given the manifest deficits in source-documentation from the Petters operation. Finally, he was to aggregate the cost of obtaining that evaluation.

The stated goal of this forensic reconstruction was to liquidate the net liabilities and rights to payment running among all of the PCI-related Debtors (and only them). These attributes were to be isolated as dual "due to" and "due from" entries for each Debtor.

This booking would correspond to asset-attributes and debt-attributes, as they lay among the Debtors. The product was to result from the specific tracking of actual dollars coming in via a given third-party loan to an SPE, through the vendor commingling up through PCI and a separate commingling there, and out to a different, misappropriating end-recipient among the other PCI-related Debtors.[49] That party was to be identified as the Debtor that then disbursed the funds to recipients outside the group of the PCI-related Debtors. The funds were not to be traced beyond that end-recipient Debtor within the PCI-related group.

At the end of his methodology for this analysis, Martens was to record "due to" and "due from" dual entries resulting from an end-receipt of funds within the group of the PCI-related Debtors. Martens saw this formal tracing of every single such transfer within the maze of PCI-related Debtors, as absolutely essential to a final netting-out of obligations running within that group. However, as he saw it, while such an exercise would be required under the abstractions of accounting procedure, the outcome would be inherently unreliable. The reasons for that were several.

First would be the inadequacies of all source-documents from the Petters operation, many of them having been prepared from falsified data and in any event subject to an assumption of untrustworthiness per se from their tainted sources. Second would be the occasional opaqueness of banking records of receipts and transfers, stymying links to particular transactions. Third would be the number of arbitrary assumptions that would have to be made in tracing through the two nodes of commingling, both of which often were daily receiving massive amounts of money from multiple outside sources and disbursing as needed in wrongful diversion, contrary to lenders' expectations.[50] And, apparently

49. As Martens testified, this was a different—and in respects more complex—task than that he previously performed for the PwC report. There, he and PwC had identified the status of thousands of particular loan transactions through the SPEs, on what was termed a "cash basis." However, the work was performed on only two points of accounting event: cash in, i.e., the receipt of a loan from a third-party lender in a specific amount and under specific terms; and cash-out, the later payoff of that specific loan in a specific amount. This project did *not* entail tracing where the lenders' specific infusions went after they entered, or determine the source of funds actually used to pay off such specific debts. After aggregating the thousands of note transactions, the identity of the Ponzi

scheme's "net winners" and "net losers," among the SPE-associated lenders was determined, i.e., those that got out satisfied and those that were left in with unsatisfied debt. This was the one goal of that first forensic project. Martens testified that it consumed approximately 33,000 hours of professional time and cost roughly $10,000,000.00. His statement to that effect is uncontroverted.

50. Martens testified, without controversion, that accounting principles for this sort of task would not allow the application of "FIFO," the analytic tool of "first-in, first-out" to be applied to trace assets through commingling, as it properly could for inventory accounting.

there was at least some incidence of inter-company transfers booked without the actual passage of funds.

As Martens testified, a linear tracing of every infused dollar to an end-recipient among the SPE-related Debtors could be essayed, but only with the commitment of at least the same amount of accountant time as the preparation of the PwC report had entailed, and the accrual of the same cost: 33,000 hours and at least another ten million dollars in administrative expense to the estate. And, he testified, the end-result, an attribution to each SPE and PCI of net rights to payment and net liabilities running to all others among the PCI-related Debtors, would not be "reliable" under accounting standards, i.e., it could not be properly deemed to reflect the actual, real-life consequences of the scheme's huge misappropriations. In his opinion, extensive fictitious assumptions would be necessary to complete tracing analysis within and out of the nodes of commingling. Hrg. Tr. 268:13–25, 269:1–27. Those would deprive the end result of reliability in that sense, as would the defects and incompleteness of the source material.

The objectors challenge both the predicates of Martens's analysis and his end-opinion. They argue several grounds.

First, in the case of transfers from PCI to an SPE, the objectors argue that Martens's accounting method would be "unreliable" because it would use fabricated documents (e.g., forged bank statements, false wire transfers, false purchase orders, etc.). They note that Martens himself expressed serious doubts about the reliability and utility of SPE financials. *Id.* at 272:12–21. Hence, they dispute that an analysis of transfers internal to the PCI-related Debtors beyond the receipt into a pooling by

PCI is necessary for any administrative purpose.

Second, they argue that the end-step of Martens's methodology would require the booking of non-existent transactions: no transactions actually ran directly between SPEs, and giving cognizance to such a fabrication would have no justification in accounting principles or otherwise. They use, as an example, that if PL received funds from PCI that had their traced origin in a loan to PC Funding, Martens would book a "due to PC Funding" on PL's books and a "due from PL" on PC Funding's books as the end-result.

Anchored by their own accountant's testimony, the respondents make a fair point in the abstract: that documented *transactions between* the two SPEs, directly and in the strict and legitimate (contractual) sense, did not occur. In fact, they say, as evidenced by the claims registers for the various Debtors, all intercompany liabilities that are currently-asserted as a formal matter in these cases, run between PCI and individual SPEs or vice versa, and none run directly between two SPEs. See Addendum 1 to Trustee's Closing Arg. Brief (summarizing the claims registers for these cases).[51]

Third, the objectors point out that Martens's proposed methodology would not trace any transfer of money outside the circle of PCI-related Debtors, even if records indicated that money in the flow went to another company in the Petters enterprise structure like the Polaroid Corporation. They impugn this as an inconsistency that Martens inexplicably refused to explain, and in consequence would have his whole methodology deemed unreliable on account of incompleteness.

---

**51.** Logically, this point goes more to the relevance of Martens's conclusions to these cases, than it does to their reliability as measured by accounting standards.

### Paul Charnetzki (Epsilon/Westford)

Paul Charnetzki was proffered as an expert to counter Martens's testimony. He is an accountant at Grant Thornton. He has an MBA from Carnegie Mellon, and he is a CPA with a certification in financial forensics. From 1977 to 2002, he worked at Arthur Anderson where he became a partner in 1989. Beginning in the mid–1980s, he began to concentrate on forensic accounting services. In 2002, he left to form Huron Consulting Group with a group of other partners from Arthur Anderson. There, he again focused on forensic accounting. Since 2010, he has done similar work at the Grant Thornton accounting firm. He has given testimony as an expert accountant at least 15 other times, "about the measuring damages, measuring assets and liability for solvency and sometimes about accounting transactions should have been accounted for." Hrg. Tr. 878:5–9.

The Epsilon/Westford parties offer and rely on Charnetzki's opinion that a forensically-reconstructed accounting for the assets and liabilities of each debtor as a separate legal entity would not be cost-prohibitive or particularly time-consuming. Opportunity Finance relies on his opinion for the same reasons. The Trustee argues that Charnetzki is unqualified and that his opinion is unreliable.

Compared to Martens, Charnetzki's on-point expertise is lacking. Charnetzki is qualified to offer expert opinions for more general forensic accounting tasks. However, he does not have experience in tracing and splitting out the commingled assets and liabilities of entities embroiled in a Ponzi scheme. This lack of situation-specific expertise need not disqualify his expert testimony, as inadmissible. However, as a matter of credibility, his opinion is not entitled to as much weight as Martens's.

As for Charnetzki's reliability, the issue is two-fold: whether he reasonably applied a consistent methodology, toward the specific question before the court. Unlike Martens, who estimated the cost to be about ten million dollars, Charnetzki opined that the cost of what *he* envisioned would be about $600,000.00.

As noted above, Charnetzki's accounting methodology would entail recording "due to" and "due from" entries for each of the transactions that *actually* occurred, pursuant to whatever objective memorialization may be linked to their occurrence. Hrg. Tr. 879:11–880:15. According to Charnetzki, this process would not be as time-consuming or expensive because PwC has "already" tracked all of the documented transactions. This methodology, the objecting parties argue, is more in line with accounting standards than Martens's methodology because it would not attribute reality to hypothetical transactions running between SPEs and there would be no need to draw inferences about the sources and uses of money flowing through the SPEs toward PCI. The Epsilon/Westford parties call Charnetzki's approach "straightforward and simple." E/W Closing Arg. Brief at 36.

The internal difference between Martens's and Charnetzki's approaches is the end-event contemplated by their methodology. Charnetzki would attribute a flow of specific money from the SPE-recipient of loaned funds, directly through an ostensible vendor, and the balance to PCI. He would do so on an assumption that all such movements took place very close in time, on the same day usually. And his methodology would then stop at PCI, in the repose of the pool in the M & I bank account. At that point, from the perspective of the original SPE-borrower, he would book a "due to" to the third-party lender, and a "due from" to PCI.

His justification for ending there was his attribution to PCI of complete "discretion" in its control over the M & I account, which he equates to a right to direct any and all funds on deposit to wherever it chose, without an obligation to account to the original source-SPE. There seems to be an unvoiced quasi-legal predicate thought under this, that this "discretion" terminated any obligation that PCI would have had to account for its use of the commingled funds, to any party in the flow of funds toward PCI.

Charnetzki saw no need to recognize any commingling at the vendor-node, because he envisioned that point as a mere pass-through that happened so quickly ("immediately"), as to lack significance for accounting purposes. (He did not concede any effect on his characterization from the fact that the vendors consistently helped themselves to commissions; and he had no credible response when presented with evidence that Nationwide and Enchanted usually received multiple payments in large totals from several Petters-related SPEs and other sources almost every day, and deposited them in one pooled account from which they disbursed to PCI and elsewhere.)

He also flatly denied that any commingling of SPE-generated, lent-in funds could be recognized on or after receipt by PCI. He saw the relevant, bookable "asset" of the SPE-source at that point as being the resultant "due from" PCI, and he insisted that "that asset isn't commingled."

The Trustee argues that the simplicity of Charnetzki's approach creates a lack of reliability. He insists that Charnetzki's methodology ignores evidence, fails to recognize commingling at the vendor level and PCI level, and is grossly generalized.

Apart from the lesser weight to be accorded it on a weighing of the two experts' qualifications, Charnetzki's opinion on the necessary accounting tasks is just not reliable, because it is not directed to the issue actually at bar.

■ Under *Daubert's* progeny, one important factor for reliability is whether the expert sufficiently connected the methodology for his analysis and the content of his opinion with the facts of the case. *Lauzon,* 270 F.3d at 687. Charnetzki's opinion is partly based on his unvarnished characterization that *no* commingling occurred at the vendor level, and his refusal to give any significance to what happened to lender-sourced money after PCI received it. Hrg. Tr. 896:22–24. According to Charnetzki, "the asset is still at the SPE level and it's a due from PCI." *Id.* at 896:17–21. In other words, once the funds left the SPE's control, the SPE's asset became a "due from PCI," and that is the only recourse as to the funds that may be deemed for the purposes of accounting.

This treatment of assets and liabilities is far too abstract for the concrete mission in question here, and it does not even apply to it. Beyond that, Charnetzki did not explain whether his methodology is generally accepted, and he did not justify it in light of any standards for forensic accounting as applied to a scheme of fraud purveyed by commingling through multiple entities.

And, most damningly, his methodology simply did not respond to the specific needs of the bankruptcy estates as posed by this motion. Charnetzki refused to give any significance to the origin of the problem in a massive, multi-staged misappropriation of funds, at the end of which there were aggrieved SPE-parties linked to outside lenders satisfied or unsatisfied. Even at the abstract plane of accounting, where financial posture is to be reported transparently and accurately, he would just have the end-results of the fraud remain

where they were, i.e., net losers among the SPEs (and their associated lenders) left with a traceable avenue of recovery only through to PCI, and the end-recipient net winners, SPEs and their lenders, left with the benefit of their receipt of stolen money.

In administering the estate, a trustee in bankruptcy is not to accept the posture of assets and parties as they appear or as they stand, right after debtors' financial failure. In a case where the failure was the result of debtor wrongdoing, and the law gives injured parties rights of recovery in consequence of that wrongdoing, a trustee must recognize such consequences and take them fully into account in administering assets and claims. And, in cases of related debtors where systemic wrongdoing gives rise to such claims cross-running between the estates, the trustee must take action to fix and liquidate those claims in order to finance distribution rights.

This is not at all what Charnetzki envisioned toward formulating the analysis for his proposal of tasks. He would take the tracing only so far—up to PCI—and would stop there. His rationale for curtailing the search neither had a sound basis in law or logic. Nor did it respond to the administrative need for professional service his opinion was to address.

For those reasons, Charnetzki's opinion is not reliable, and hence is not probative of the actual issue at bar.[52] Martens's opinion is the only one going to the need for particular accounting services to responsibly administer the PCI-related Debtors' estates, were they left separate.[53]

This is also why the objectors' cavil fails, as to Martens's refusal to trace beyond SPE-recipients to other Petters-related companies. Such an extended tracing simply was not relevant to the defined accounting task, which in turn was matched to only one part of the Trustee's job of finalizing the complexion of assets and liabilities—*within the circle of the PCI-related Debtors*. The potential recovery of money transferred outside of that ring was not among the trustee's tasks for which the forensic reconstruction was to be done, that were relevant to the standard for substantive consolidation.

To explain: the Trustee was first confronted with a tight aggregation of related entities that had been very financially active with each other, bound together in a parent-subsidiary relationship and a web of contractual relationship but nonetheless having done all sorts of things among themselves that were not authorized under contract or law. That was the first tangle the Trustee had to remedy. It had to be

52. This conclusion does not even reach another problem with Charnetzki's opinion, his quantification of likely cost. Martens's estimates for time and cost assumed that there was "a tremendous quality control effort as well to do," Hrg. Tr. 267:14–15, i.e., the vetting of all source-data for authenticity before use. Charnetzki's estimate does not appear to include any allocations for quality control. Hrg. Tr. 884:3–12. Instead, he appears to have only estimated time and cost for creating journal entries from actual records used, verifying transactions against contractual origin, and creating the end-statements of assets and liabilities. Hrg. Tr. 884:6–12.

53. Even if Charnetzki's conclusion were more reliable than Martens's, the victory would only be minor. Under the *Eastgroup/Auto-Train* line of cases, the degree of difficulty is merely one factor that a proponent of substantive consolidation *may* highlight when making its prima facie case. See *Eastgroup*, 935 F.2d 245, 249 (11th Cir.1991). Even under *Owens Corning* and *Augie/Restivo*, which are not applicable under *Giller* anyway, the entanglement of assets and liabilities is only one of two critical factors, but the presence of the other factor (treating the entities as one unit) can be a sufficient basis for consolidation.

organized before he could parcel the estates' value through the channels dictated by the intercompany structure. The problem was, the misuse of the structure and all of the unauthorized transfers created a tangle of obligations and rights under law that would have to factor into that channeling.[54]

So the Trustee limited his inquiry to everything within that ring. What transpired when money departed the ring would be relevant to a different, later part of administration. Hence an accounting that included that tracing-out was simply not part of Martens's charge. Nor was its end-result relevant to the issues before the court.

### iii. Outcome, as to Inquiry into Cost and Burden

Martens's testimony supports the findings now made, that an accounting to reconcile all intercompany transfers among the PCI-related Debtors would be costly (to the tune of at least ten million dollars, for at least 33,000 hours of accountant time), and once done would not be a wholly reliable reflection of cross-running assets and liabilities that were lawfully-entitled. The Trustee arguably could not make justified or responsible use of the end-product in mapping out the first stage of allocation in administration, among the *separate* estates of the PCI-related Debtors.

Substantive consolidation would make this whole exercise unnecessary. At the very least, it would save the estate the costs of the forensic accounting in reconstruction. Further along, it would save the estate the costs of defending Martens's conclusions against challenge on the lack of the reliability he himself could not warrant, were the actual, dollar-measured parity between given SPEs ever to become an issue in the administration.

The conclusion is clear: the estates of all of the PCI-related Debtors would substantially benefit from substantive consolidation.

### b. Necessity, as it Bears on Estate Administration

 Under *Vecco*, a key factor to consider is the degree of difficulty in segregating and ascertaining individual assets and liabilities, among debtor-entities. 4 B.R. at 410. Martens established that this would be very difficult, and the results not trustworthy, were this done on the posture of separate estates. This would make the likelihood of a fair, principled allocation much lower, and certainly more costly. And that allocation is not imperative in an equitable sense, with the ubiquity of commingling all the way through to the Debtors' failure plus the degree of internal and external melding among them. As will be seen in the second and third considerations, upon consolidation the chance of disproportionate dilution falling on particular creditors is not high.

This record establishes that consolidation is necessary within *Giller's* contemplation, to enable the fullest and most principled redress to all creditors of these Debtors.

### c. Necessity, as it Bears on Adjudication in Equity (Consideration of Creditor Reliance)

A major portion of the three days' worth of evidence was directed to one of the main thrusts of the respondents' defense: the respondents had insisted on and obtained the establishment and maintenance of separateness between PCI and their own SPEs; and their reliance on that separateness was pivotal to their decisions to lend to the Petters enterprise. This reliance, they argue, supercedes all other consider-

---

**54.** And the assertion against all of the PCI-related Debtors' estates, of multiple, duplicative creditors' claims based on assertions of joint and several liability in tort, created a different layer of complication stemming from the corporate structure.

ations and gives them an unassailable bar to substantive consolidation.[55]

The tone of this argument resonates most directly with the Third Circuit's approach. It also dovetails into the standard adopted in *Augie/Restivo*. It has no firm basis in current Eighth Circuit precedent, however. *Giller* does not even expressly acknowledge *ex ante* reliance by creditors as a consideration, whether as part of a movant's case in chief or as an affirmative defense, ala the tests from the Second and Third Circuits. Treating the motion at bar strictly within the four corners of *Giller's* analysis, it arguably would not be necessary to even address *ex ante* reliance.

However, on examination of the evolving theory of substantive consolidation, the Eighth Circuit may parse the remedy more closely and might take cognizance of *ex ante* reliance in a revision of the *Giller* standard. With that in mind, it is prudent to examine the detailed record that the parties made on this point, and to fit it into an analysis that otherwise must center on *Giller's* rulings.

Examining creditor reliance on a refinement of *Auto–Train,* the court in *Eastgroup* observed that a creditor may be estopped from asserting a reliance defense to substantive consolidation "where a reasonable creditor in a similar situation would *not* have relied on the separate credit of one of the entities to be consolidated ... in light of all the facts." 935 F.2d at 249 n. 11 (emphasis added). Considered in that light, the consideration of

*ex ante* reliance arguably factors into the analysis of necessity under the second aspect of *Giller's* first consideration, as well, at least where the evidence makes out a lack of actual or reasonable reliance on separateness. The point here is that it may be "necessary" to consolidate the entities to reflect reality and maintain equity, if the objecting parties never expected to exclusively treat them as separate, and took actions that in fact did not treat them consistently and exclusively as separate.[56]

Evidence going to creditors' due diligence performance in the establishment and operation of related debtor-entities is relevant to this analysis, i.e., whether the parties reasonably relied on the separateness of the entities.

The parties offered the testimony of three witnesses, proffered as experts, as to the standards for lender due diligence in the context of transactions like those ostensibly purveyed by the Petters enterprise that were to be closed through an SPE structure. In total, three experts testified on due diligence standards: Myron Glucksman, Martin McKinley, and Kenneth Simon.

### i. Side–Issue: Qualification of Myron Glucksman, Martin McKinley, and Kenneth Simon as Expert Witnesses; Reliability of Qualified Experts' Opinions

**Myron Glucksman** (Epsilon/Westford)

Myron Glucksman is currently the president of his own consulting firm through

---

**55.** In the opening salvos on this motion, the point of reliance on separateness was brandished toward a baleful prediction: a ruling on substantive consolidation adverse to the objectors could lead to the end of structured finance ... as we know it. This rhetorical flourish elided the real point of the Trustee's position: the failure of a particular SPE's separateness due to defects in its constitution or errancy in its operation does not affect the general legal viability of the vehicle, at all.

**56.** Reliance is addressed at this point and in this way to keep with the framework of *Giller*. Under *Auto–Train*, the evidence at bar would meet the Trustee's *prima facie* burden, which would shift the focus to whether the objectors have proven reasonable reliance as an affirmative defense. The slant of the evidence may direct whether it is relevant within the proponent's prima facie case under *Giller*, or not—as will be seen.

which he regularly provides expert advice to investment banks, law firms, and companies on asset-backed securities and other structured finance matters. He has a law degree. He was previously a managing director at Citibank, where he worked on "dozens" of transactions over the course of 16 years.

The Epsilon/Westford parties rely on Glucksman's testimony that: (1) the structure of the Petters-related SPEs was typical of structured finance transactions; and (2) various factors highlighted by the Trustee (e.g., lack of an independent director, guarantees, flow of funds through the originator's account prior to remittance to the SPE's account) do not affect the separateness of the SPEs.

The Trustee's argument is simple: Glucksman has no relevant experience. The Trustee is correct because Glucksman has no experience in purchase order financing, as granted to an SPE. Given the more complicated structures and processes used for the Petters lending transactions, with their specialized subject-transaction, multiple involved parties, and a variety of rules for queuing up the components of purchase-order financing, his testimony must be given relatively little weight.

In addition, the Trustee tacitly raised a *Daubert* issue. Glucksman's analysis of separateness entailed the consideration of three factors: structure, documents, and conduct. Hrg. Tr. 864:2–6. During his testimony, the Trustee pressed Glucksman as to whether he would consider reliance on SPE separateness reasonable if he had seen that the lender had not engaged in any due diligence on the transaction. Glucksman responded: "No. I'd have a problem giving my opinion." *Id.* at 864:7–12. It became clear during the hearing that Glucksman had not really looked into what, if any, due diligence the lenders to Petters had performed as to the underlying transactions. If he had, and had discovered that no due diligence was performed, then he necessarily would have had a "problem" delivering his opinion here. In other words, one key variable (due diligence) was not fully considered. Thus, Glucksman's ultimate conclusions are not reliable because, under *Daubert* and its progeny, there is a "potential rate of error" and his broad-brush opinion is not sufficiently connected to the facts of these cases.

### Martin McKinley (Trustee)

Martin McKinley has a banking background with Norwest Banks/Wells Fargo, where he gained experience in asset-based lending, and with Trans Cap Association, where he gained experience in purchase order financing. The Trustee offers McKinley's testimony as an expert opinion on the due diligence required of lenders for purchase order financing.

In short, McKinley opined that: (1) there are three core disciplines of purchase order financing; (2) those disciplines were not followed by the lenders here; (3) if the disciples had been followed, the lenders would have discovered the fraudulent activity; (4) the loans were not securitizations; and (5) given the lack of adherence to the core disciplines, no reasonable lender would have looked to the separateness of the SPEs as protection for the loans. Opportunity Finance and the Epsilon/Westford parties argue that his testimony is irrelevant and that he lacks experience. The Epsilon/Westford parties also argue that his testimony is unreliable.

As for relevancy, the objectors are correct in an isolated way; but they also miss the point. Surely, whether the lenders *should have* discovered the fraud is not an issue for substantive consolidation. However, what is relevant is what the lender would have discovered had they performed

their due diligence in accordance with the core disciplines.

As for his experience, the objecting parties note that he has no experience in purchase order financing involving SPEs. This misses the purpose of his testimony, which was to opine on the appropriate level of due diligence *for* a purchase order financing transaction, regardless of the vehicle. It appears that purchase order financing is more of a niche field than basic structured financing; so, experience with just purchase order financing rather than just undifferentiated financing through an SPE is more helpful for a fact-finder's understanding of that industry.

Interestingly, the Epsilon/Westford parties' reliability argument is tied to McKinley's alleged lack of experience. They cite *Housley v. Orteck Int'l, Inc.,* 488 F.Supp.2d 819, 825–26 (S.D.Iowa 2007), a non-controlling district court case that noted, "The Eighth Circuit when applying the *Daubert* standard requires that a proposed expert have formal training in the area he is called to testify about or, at the minimum, some practical knowledge or experience that would provide him the necessary expertise in that area." As discussed previously, *Daubert* and its progeny in the Eighth Circuit treat the *reliability* of a qualified expert. Expert *qualification* is a preliminary issue, which the Epsilon/Westford parties did not even formally raise. The Epsilon/Westford parties emphasize that McKinley's opinions are based on his personal experience, noting that he did not survey other businesses in the industry. However, *Daubert* and its progeny make it clear that experience-based testimony is sufficient.

The only possible reliability issue is the application of purchase order financing due diligence principles to a situation involving SPEs. It is not unreasonable to apply such principles here, when the only difference would be uncertainty about which entity is charged with performing due diligence, i.e., the senior lender, the junior lender, or the servicer. To find it unreasonable would be to say that all due diligence principles that are core to the purchase order finance industry do not apply when the parties structure the transaction with a SPE. That makes little sense.

### Kenneth Simon (Trustee)

Kenneth Simon is a licensed CPA at Loughlin Management Partners & Company in New York. *See* C.V. of Kenneth Simon, Exh. PCI_33. Since 1982, he has focused on bankruptcy matters, particularly from the side of creditor rights, providing financial advice to over 100 committees of unsecured creditors. He has worked on approximately 50 "retail bankruptcy cases." Of those cases, he worked on one where the debtor was a wholesale distributor of consumer electronics and other products. Over the course of his career, he has become familiar with asset-based lending, special purpose entities, and even substantive consolidation. The Trustee relies on Simon's identification of various due diligence procedures and his opinion that the parties failed to conduct effective due diligence, thereby rendering their reliance on the structure of the SPEs unreasonable.

Opportunity Finance and the Epsilon/Westford parties argue that Simon's testimony is irrelevant and that he lacks the requisite experience and qualifications to opine about the appropriate level of due diligence in purchase order financing transactions. *See* Opp. Fin.'s Closing Arg. Brief at 34; E/W's Closing Arg. Brief at 28. These objectors used the same arguments against McKinley's testimony, but they are likely stronger against Simon's testimony.

The objectors' relevancy argument is as weak against Simon as against McKinley,

and one would have to accept that due diligence is irrelevant in order to agree with the objectors. However, in the objectors' favor, Simon admitted that he is not an expert in purchase order financing and that he has never undertaken due diligence analysis for an entity considering lending to a diverting business. The lack of experience makes his testimony less credible. More importantly, his opinion is largely based on the opinions of others, whom he called to learn more about the steps for due diligence in purchase order financing. During testimony, he could not remember his sources' names, and he did not know whether they had ever worked on a purchase order financing transaction involving a SPE. Hrg. Tr. 998:1–999:12. Beyond that, Simon did not undertake any factual investigation of any documents or other materials to determine whether any of the lenders here had undertaken the due diligence steps. Hrg. Tr. 1000:6–12. As a result, Simon's testimony is not sufficiently reliable, even if received simply for education on due diligence principles without any concrete application via opinion.

### Conclusions as to the Three

■ Of the three, Martin McKinley, one of the Trustee's witnesses, offered the most helpful and reliable testimony because he actually has purchase order financing experience and he did not rely on the opinions of others in reaching any of his conclusions. The testimony of the Trustee's other due diligence witness, Kenneth Simon, lacks reliability under *Daubert*, because he had to rely on the opinions of other unnamed sources as to the specific subject matter of purchase order financing. Hrg. Tr. 998:1 to 999:12. As for Myron Glucksman, Epsilon/Westford's witness, his testimony is not reliable because he had no experience in purchase order financing.

McKinley identified three core principles, or "best practices," of purchase order financing: (1) the lender must always verify the purchase order; (2) the lender must always maintain control over the movement of the goods; and (3) the lender must maintain cash dominion, meaning that payments are made directly to the lender. Hrg. Tr. 937:24 to 938:11. The Eighth Circuit recognizes that, in some cases, it is "important 'for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.'" *United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir.2011) (quoting Fed.R.Evid. 702, Advisory Committee note). In turn, since due diligence for purchase order financing is outside the experience and knowledge of lay people, the principles outlined by McKinley may appropriately be used to draw inferences or conclusions without necessarily adopting McKinley's conclusions.

Since McKinley is a *Daubert*-qualified reliable expert, however, his conclusions are helpful for the reasonable reliance analysis. Most importantly, he opined that, although the loans were ostensibly given to finance purchase order transactions, "none of the core disciplines of purchase order financing were practiced" by the objectors. Hrg. Tr. 936:1–5. The following fact-finding regarding each objecting party's due diligence bears out McKinley's own opinion.

### ii. Analysis: Reasonableness of Lenders' Reliance on Separateness SPF (Opportunity Finance f/k/a IIO)

Opportunity Finance's reliance on the separateness of SPF, if any, was unreasonable.

First, as shown above, interrelatedness was obvious from the face of the foundational documents for the lending relationship. The proposal form, attached to the

Credit Agreement, requires SPF to disclose the identities of the seller and the buyer of the merchandise to Opportunity Finance. Exh. OF_060_0020 at "Exhibit A" (subsumed within SPF_003). Implicit in this structure is that SPF (or PCI) would have received a purchase order from the retailer-customer and had given a purchase order to the vendor. *Id.; see also* Exh. OF_060_0004 at 2.1(a)(i) (subsumed within SPF_003).

The other important term of the proposal was the details of the Assignment Agreement between PCI and SPF, under which PCI was to assign all right, title, and interest in the underlying inventory sale to SPF. Exh. OF_062_001 at I.B. (subsumed within SPF_003). This is source from which SPF was to eventually get the account receivable, which in turn was to be the source from which Opportunity Finance would be paid. The Credit Agreement and the Assignment Agreement have no provision dictating when the assignment was to occur. *See* Exh. OF_060; *see also* OF_062 (subsumed within SPF_003). It is implied that the account receivable was not in existence at the time of the assignment. This implication is also supported by the fact that the Purchase Order was the instrument assigned, with its associated rights *as they* arose later. *See* Exh. OF_062_0005 at "Exhibit A" (subsumed within SPF_003).

Once Opportunity Finance agreed to lend, it was to disburse to SPF. The Credit Agreement required that the funds be disbursed directly to the Seller (vendor). An intermediate transfer into the PCI account was not provided for. Exh. OF_060_0005 at 2.2(a) (subsumed within SPF_003). Once the goods were delivered to the retailer-customer, an account receivable was to be created. The Credit Agreement contemplates, or rather prefers, the payment of that account receivable directly to SPF. *Id* at 2.2(b).

In reality, funds pretensed as being linked to an account receivable were paid into PCI's M & I account. From there money was wired within 24 hours to the SPF account. Martens Hrg. Tr. 60:19–23. After those funds made it into the SPF account, they were disbursed back to Opportunity Finance in repayment of the loan, with principal and interest. The remaining fictive balance was then transferred back to PCI as ostensible profit.

The Credit Agreement contemplates that SPF had the ability to broker these transactions itself from beginning to end. Exh. OF_060_004 at 2.1(a)(i) (subsumed within SPF_003). However, PCI and SPF entered a Management Agreement under which PCI was to act on SPF's behalf and essentially perform every function of the deal-making. *See* Exh. OF_065 (subsumed within SPF_003). In theory, if PCI acquired an account receivable in its capacity as agent under the Management Agreement, the ownership was to rest in SPF and no assignment would be necessary. But for that to be documented toward legal effectiveness, Tom Petters (the one who was at the center) would have to take very careful, consistent, technical steps to refrain from purporting to act for PCI in a proprietary capacity, and to overtly act for SPF in an agent capacity. The likelihood of that being done consistently was most likely perceived as low, which is probably why this management agreement was put into place. In any case, there is no evidence that SPF ever purported to document transactions as directly brokered with an ostensible vendor and an ostensible retailer.

In the end, the key point for separateness is that Opportunity Finance was totally dependent upon PCI's follow-through compliance with the Assignment Agree-

ment. If PCI didn't make the assignment, SPF would have been stuck in the lurch, with no capital and no ability to repay the outstanding debt to Opportunity Finance.

This argument is further bolstered by other provisions in the Credit Agreement:

§ 4.5—Prohibited the Borrower (SPF) from owning any other material property beyond the inventory subject to the sales. SPF was prohibited from owning any hard assets that a lien could attach to or that could be liquidated to satisfy Opportunity Finance's loan. Exh. OF_060_0009 (subsumed within SPF_003).

§ 5.6(a)—Prohibited the Borrower (SPF) from owning any other assets or conducting any other business than the Inventory Purchase/Sale deals contemplated in the credit agreement. *Id.* at _0010 (subsumed within SPF_003).

The only way terms of this arrangement permitted SPF to pay off a loan to Opportunity Finance was through the assignment of and the collection on the corresponding account receivable from PCI. The actual execution of that assignment was completely dependent on PCI's good graces. The assignment of the rights to the transaction from PCI to SPF was not a condition precedent to the lending. The actual condition precedent is that the lending has to occur before the assignment and not vice versa. Exh. OF_062_0001 at I.B. (subsumed within SPF_003).[57] Clearly, Opportunity Finance was to lend the money and then hope *PCI* complied with its *separate* obligation to SPF.

Simon Root notified Jon Sabes of the lack of bankruptcy-remoteness between SPF and PCI by May 2001. But IIO (and then Opportunity Finance) continued to lend to Petters Finance/SPF after that. *See* PwC Flow of Funds Report, Exh. OF_024_0005 (listing notes to Opportunity Finance with starting dates). As that exhibit summarizes, Opportunity Finance continued to lend to SPF as late as March, 2005, a long time after Opportunity Finance and PCI created PCF in an attempt to address SPF's lack of bankruptcy-remoteness. Another Opportunity Finance party, the Sabes Family Foundation, made loans to SPF until at least May 2007. Exh. OF_024_0009.

Second, Opportunity Finance continually relied on PCI as a financial "backstop." Opportunity Finance accepted the possibility of Petters Finance/SPF drawing upon any external source in order to repay Opportunity Finance's loans when due. Section 2.2(c) of the Credit Agreement allowed Petters Finance/SPF to draw upon sources other than the retailers in order to pay off its debts to Opportunity Finance. Exh. OF_060_0005–_0006 (subsumed within SPF_003). Just before closing on the original arrangement, the parties added § 2.2(c), which provided that each Promissory Note in favor of IIO was due on the 150th day *or* when Petters Finance received funds from the Buyer, "*whether or not* [Petters Finance] shall have received payment from the Buyer under the Buyer Purchase Order related to such Promissory Note." *Id.* (emphasis added). *See also* Email from Simon Root to Tom Petters ¶ 1, Exh. SPF_037.0001 (noting addition). Pointedly, § 2.2(c) also provided:

It shall not be an Event of Default under this Agreement or the Loan Documents if a Buyer does not pay an underlying Buyer Purchaser Order when due, provided the related Promissory Note is paid on or before its due date (it being

---

**57.** Assignment Agreement in fact explains "if Assignee is successful in arranging such financing with Lender with respect to such proposed Inventory sale, Assignor will ... [execute the assignment]."

acknowledged that Borrower has until the Promissory Note due date to receive payment from such Buyer *or to otherwise pay the Promissory Note from other sources* ).

Exh. OF_060_0005_0006 (subsumed within SPF_003) (emphasis added).

Section 2.2(c) conclusively shows that Opportunity Finance *knew* it had a financial backstop beyond SPF that would help to ensure repayment when due. Meanwhile, Opportunity Finance also knew that the "separateness" covenants in the Credit Agreement contractually required SPF to pay all of its own liabilities out of its own funds. Section 2.2(c) undermined that covenant. The inconsistency established a lack of separateness.

Under the structure of this complex of relationships, Opportunity Finance took substantial risk on two levels: the first in lending money that might not get repaid, and the second in PCI's compliance with the associated agreement.

Opportunity Finance tried to control that second risk, and it contracted for that control. The control lay in Opportunity Finance's ability to take recourse against PCI on two levels. This clearly manifested reliance on PCI, as intertwined with SPF. *See* Exh. OF_060_0010 at 5.5 (subsumed within SPF_003); *See also* SPF_036 at Para. 1, SPF_037 at Para. 3.

First, the lending structure between Opportunity Finance and SPF provided that Opportunity Finance could receive payment from PCI directly. Opportunity Finance was permitted to file a financing statement against PCI directly, per the Assignment Agreement. Exh. OF_060_0010 at 5.5 (subsumed within SPF_003). The Assignment Agreement provided that if such an assignment were deficient, notwithstanding the intent of the parties, that PCI granted Opportunity Finance a security interest in the rights to the financed sale. Exh. OF_062_0003 at II.4 (subsumed within SPF_003).

Before the documents were executed, Simon Root warned Jon Sabes about this arrangement, and specifically advised that it might render the use of an SPE meaningless. Exh. SPF_036. If Opportunity Finance truly wanted to separate itself and SPF from PCI, the Sabeses should have limited their recourse to personal guarantees by PCI and Tom Petters, instead of taking security interests in assets held by PCI. They were warned of this fact before closing the transaction and ignored it. Opportunity Finance clearly wanted to make sure it could take all recourse against both PCI and SPF, as related entities.

The final aspect of Opportunity Finance's use of PCI for backup recourse is the designation of Opportunity Finance as a third-party beneficiary to the Assignment Agreement between SPF and PCI. As such, Opportunity Finance granted the right to enforce all rights of the Assignee (SPF) against the Assignor (PCI).

The argument could be made that this was in fact a step toward remoteness. If there were no assignment because PCI chose not to assign, Opportunity Finance had to step in to pursue PCI directly. In that instance, it would be doing so only on behalf of another corporation, not for its own direct benefit.

However, given the limitations on SPF's ability to generate income and the bar on its engagement of outside business, the reality is that Opportunity Finance would be financing a breach claim for its own benefit, in essence making it a lawsuit against PCI for itself. There does not appear to be a situation where Opportunity Finance would not have direct action or recourse against PCI. The direct recourse against PCI makes the entire existence of SPF largely irrelevant. But that, in turn,

was a feature of PCI's entanglement in a financing transaction that was to have been segregated into a box around SPF.

Another factor undercutting separateness lay in the prominent role that PCI's underlying credit-worthiness played in Opportunity Finance's decision to deal through Petters Finance/SPF. As noted previously, PCI was a guarantor of the debt of Petters Finance/SPF to Opportunity Finance. Exh. SPF_003 OF_SC_00000102. Notably, PCI's guaranty includes an acceleration clause that makes the total obligation due and payable immediately upon the dissolution or insolvency *of PCI*. Corporate Guaranty ¶ 4, *Id.* at OF_SC_00000108. Thus, given the face of the guaranty, at least as much importance was accorded to PCI's credit-worthiness as to the integrity of the collateral given through PCI and/or Petters Finance/SPF. Jon Sabes confirmed during his testimony that, because of the guarantees, Opportunity Finance looked to the credit of PCI and Tom Petters when it made loans to Petters Finance. Hrg. Tr. 413:12 to 414:5.

This is embodied in an isolated side-aspect of Opportunity Finance's rights on default. Since SPF's only ability to pay off its loan to Opportunity Finance was through collection on an underlying sale of inventory to a buyer, that sale had to generate enough funds to cover repayment of the original loan amount plus any late payment penalty. Opportunity Finance took the risk that the underlying sale would not generate enough funds, in which SPF would be unable to pay off its penalty; and thus the recovery on that penalty payment would have to come from some-

where else-likely PCI.[58] As a result, Opportunity Finance cannot credibly argue that it did not rely on the credit-worthiness of PCI, or on the availability of satisfaction from PCI for the penalty charged. Section 2.4 of the Credit Agreement imposed a 20% APR interest on late payments. Exh. OF_060_0006 (subsumed within SPF_003).

Equally crucial is a circumstance from the parties' actual practice: the Sabeses knowingly allowed commingling even though they knew it undermined separateness. As noted above, commingling was prohibited under the Credit Agreement; but to opposite effect the Assignment Agreement suffered it to occur, albeit temporarily. *Compare* Exh. OF_060_0011 at 5.6(h) (subsumed within SPF_003) *with* Exh. OF_062_0002-_0003 at II.3 (subsumed within SPF_003). Internally, Opportunity Finance was more than aware of this contradiction, and the jeopardy it caused to any assertion of separateness: in an August 2001 email to Bob Sabes, Steve Sabes opined that commingling of funds defeated the purpose of using an SPE. Exh. SPF_043. In fact, Opportunity Finance (at the behest of its senior lender) required PCI to take a stake in the purchase of inventory by contributing an "equity kicker," i.e., a portion of the purchase price ostensibly to come from its own assets. *See also* OF_023_0002; Martens Hrg. Tr. 198:12-199:14.

Finally, Opportunity Finance failed to conduct reasonable due diligence for its provision of purchase order financing through the vehicle of SPF.

To be sure, some facial aspects of the transactions as pretensed might reason-

---

**58.** In "reality" as these transactions played out, the profit margin on any given sale that PCI deemed for itself and extracted was only 10%. So even if Opportunity Finance wasn't observant of the risk of non-payment and a resulting collection from PCI based on the face of the documents, it should have been alerted to the fact that these transactions consistently only netted 10% in ostensible profit— which would have not been enough to cover a 20% penalty. Martens Hrg. Tr. 255:24-256:6.

ably provide comfort to a lender. For example, under § 4(f) of the April 2001 Security Agreement, Petters Finance represented that the Accounts (i.e., the purchase orders) "represent bona fide sales of inventory or rendering of services to Account Debtors. . . ." Exh. OF_061_0006 (subsumed within SPF_003). Further, a guaranty of the bona fide character of submitted invoices with Costco as named and ostensible customer was among the closing documents for the April 2001 deal. Exh. SPF_003 OF_SC_00000132– _00000134.

But even so, under § 3(c) of the Security Agreement, Opportunity Finance had a right, at any time, to "communicate with Account Debtors, parties to Contracts, obligors of Instruments and obligors with respect of Chattel Paper *to verify* with such Persons, to [Petters Finance's] satisfaction, *the existence*, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper." Exh. OF_061_0005 (subsumed within SPF_003) (emphasis added). Despite that, Opportunity Finance invariably relied on blandishments from Petters Finance/SPF that the sales were actually in process. No one on behalf of Opportunity Finance *ever* contacted any of the identified ostensible retailers to verify the existence of the supply agreements or accounts for the ostensible diverting transactions. Jon Sabes Testimony, Hrg. Tr. 432:14–17, 500:18–20. In turn, Opportunity Finance did not comply with any of the core due diligence principles for giving purchase order financing that McKinley identified; and there is no evidence that contradicts McKinley's opinion as to what those were and how they should have been observed.

### PCF (Opportunity Finance)

Opportunity Finance's reliance on the separateness of PCF, if any, was also unreasonable.

The evidence does indicate that Jon Sabes intended to form PCF as a bankruptcy-remote entity. Exh. OF_057_003. In practice, however, Opportunity Finance did not rely on the separateness of PCF; and even if it did, such reliance was unreasonable in light of all the circumstances.

First, Opportunity Finance relied on PCI to serve an integral role in financial support of the PCF financing arrangement through PCF. For example, Opportunity Finance required PCI to buy into, or participate in, the PCF deals, by a 2% contribution toward the cost of acquisition of goods. Jon Sabes Testimony, Hrg. Tr. 444:2–8; *see also* Letter from Root to Sabes, Exh. PCF_042.0001 (opining that the 2% from PCI was likely part of the internal credit approval procedures).

Just as for the SPF Credit Agreement, § 2.4 of the Credit Agreement with PCF imposed a 20% APR interest charge on late payments. PCF_001.0057. As noted for SPF, if Opportunity Finance was looking solely to the collateral for payment, but PCF's satisfaction on the loan and any associated penalty was contingent upon collection on the receivable in an amount sufficient to cover what it owed, any deficiency attributable to the 20% late payment penalty could only come from another—outside—source. This was most likely PCI. As a result, it seems unreasonable on the part of Opportunity Finance to argue that it did not rely on the creditworthiness of PCI to make it whole.

Second, as with SPF but in different ways, the foundational documents for PCF set up PCF to be so dependent on outside resources that there was no operational separateness for Opportunity Finance to rely on. The LLC agreement for PCF's formation stated that PCF's existence was "limited solely to the following: . . . to

purchase ... [receivables]." Exh. PCF_001.0014 at Section 7(a). The Credit Agreement between PCF and Opportunity Finance limited PCF's use of the loan proceeds to acquisition of receivables *from PCI* and nothing more. *See* Exh. PCF_002.0004 at 2.2(a). The burden was then on PCI to acquire the inventory and sell it to a retailer in order to trigger the existence of the receivable. From the outset of the deal, PCF was totally reliant on PCI's good graces and de facto followthrough for its ability to repay Opportunity Finance, just as SPF was.

And in different ways relating to asset acquisition and value accretion, PCF was unable to function without PCI's involvement. The Credit Agreement with PCF required that PCF hold no other assets aside from the receivables acquired from PCI and PCF was only permitted to pay off its obligation to Opportunity Finance from those receivables. *See* Exh. PCF_002.0010 at 5.7(a) and (d). Unlike SPF, PCF had no opportunity to enter into inventory purchase/sale transactions in its own right and on its own motion. In order for PCF to generate any income, PCI had to do the deal.

At the fulfillment stage, and in like degree as SPF, PCF was completely dependent upon PCI for the performance on PCI's underlying contracts with retailerscustomers. If PCI did not, no receivable would ever exist. PCF would be obligated to Opportunity Finance, but it would have given the loan proceeds to PCI; and PCF would have no way to generate income to pay off its debt. And PCF also took on two levels of risk where SPF only had one. SPF ostensibly bore some sort of interest associated with the inventory since it was to disburse the loan proceeds to the vendor. With PCF, a risk lay with PCI's follow-through, i.e., whether OCU would actually use the funds received from PCF

to purchase inventory. The loan proceeds were to be disbursed directly to PCI. Regardless of what PCI's contractual obligation may have been to use those funds in a particular way, there was the chance of its nonperformance—which would have destroyed the eventual right to payment PCF bargained for and had to have to make good to Opportunity Finance.

The second risk PCF took once the inventory was acquired was whether PCI would actually sell the inventory to the retailer on acquisition in accordance with the underlying contract. Once PCI was to purchase the inventory from the seller, it became the owner of that inventory free and clear. *See* Exh. PCF_002.0049 at D.9.

In order for these deals to work smoothly for anyone to generate profit, and for PCF to remain solvent and in good standing, PCI had to follow through with its many extrinsic obligations by its own good graces.

Through the arrangements used, PCF did address a problem with the SPF structure, the acquisition of the receivable being triggered by a matter of law upon the occurrence of an event. But this did not address the de facto reliance on PCI; it merely shifted the risk to a different part of the deal.

PCF's structure did fix the PCI SPFrelated problem of being an essential backup on default—but only partially. The documents had no provision for Opportunity Finance to have a security interest enforceable against assets of PCI. However, Opportunity Finance was named a third party beneficiary to the Sale Agreement between PCF and PCI. This made PCI a de jure backup, just as it did in the SPF structure.

This whole structure clearly contemplates PCI as a security blanket for Opportunity Finance in the event of default

by PCF; PCI played an integral role in making the deal work under various permutations of risk. If PCI failed to follow through, everything fell apart for PCF and Opportunity Finance ... which is to say everything was reliant on PCI, which then could not be considered "separate from" PCF and vice versa.

And even if Opportunity Finance did actually or nominally rely on PCF's separateness, the promise of returns that were facially high makes such reliance unreasonable. The 2002 audited financial statements for PCF indicate a net loss and the lack of an equity contribution. OF_008_0006. It shows revenue of $29,185,842 and cost of revenue of $31,666,374, resulting in a net loss of ($2,480,532) for 2002. It also shows the ending balance of member's equity as negative ($2,480,532). *Id.*[59] This means that the membership equity had a beginning balance of $0 and then just kept going in the red.[60] In the meantime, PCF's notes obligated it to pay 2.50% monthly for an annualized yield of 30%. There is no evidence in the record to show how this was sustainable independently on PCF's own, isolated means. Exh. OF_026_0001.

As it turns out, Opportunity Finance is the entity that required the independent audits of PCF's finances. Jon Sabes Testimony, Hrg. Tr. 393:25 to 394:10. According to Jon Sabes, the audit opinions gave Opportunity Finance "comfort" that PCF was living up to its covenants of separateness, that it was a going-concern enterprise, and that it was maintaining its own books and records and accounting for its own assets and liabilities. Hrg. Tr. 394:11–395:4. However, neither of the Sabeses or anybody else on behalf of Opportunity Finance apparently stopped to think how PCF could possibly keep paying such high rates of return on time; or the thought came, but there was no afterthought toward action. And crucially, Opportunity Finance provided loans to PCF long after seeing the audits. *See* Exh. OF_032_0013 (showing a promissory note dated Nov. 28, 2007).

Third, it was unreasonable for Opportunity Finance to rely on the non-consolidation opinions given by the Mayer Brown and Andrews Kurth law firms for any understanding that the entities on the Petters side of the PCF arrangement were separate.

By way of background: in order for Opportunity Finance to secure its own financing from its senior lender DZ Bank, DZ Bank insisted that Opportunity Finance obtain non-consolidation opinions. This is reflected in the conditions precedent in paragraphs (h) and (p) of Schedule 1 to their Security Agreement. Exh. OF_006_0111. On *December 28, 2001*, Mayer Brown provided non-consolidation opinions for: (1) the transaction between PCF and PCI, Exh. PCF_005; and (2) the transaction between Opportunity Finance

---

**59.** The later facial appearance of member equity was the result of re-characterizing PCF's debt to PCI as a capital contribution, as previously discussed. *See* 2002 Audit, OF_008_0010 ("On April 29, 2003, the Company's sole member agreed to convert the amounts due to them from accounts payable, related party to contributed capital, a component of member's equity. In addition, the agreement increases the discount paid to PC Funding, LLC on purchased receivables from five percent to six percent."). This measure was a fairly patent manipulation without real effect toward making PCF more fiscally resiliant or freestanding.

**60.** To equal effect, Theodore Martens testified generally that PwC's forensic analysis revealed that as a general matter "there was little, if any, capitalization in the SPEs." Hrg. Tr. 249:15–20.

and DZ Bank et al. Exh. PCF_004.[61] Jon Sabes testified that Opportunity Finance "relied" on the Mayer Brown substantive consolidation opinion when it entered into the December 2001 deal with PCF, and that Opportunity Finance would not have entered into the deal without the opinion. Hrg. Tr. 381:9–16.

There are at least three bases in the record that conclusively defeat a finding that Opportunity Finance actually and reasonably relied on the Mayer Brown opinion before committing to give credit to PCF. The first is that Opportunity Finance could not have *actually* relied on an opinion that was given *after* the transaction closed: notably, both opinions were dated *after* the Opportunity Finance and PCF deal closed on December 17, 2001.

The second reason is that Opportunity Finance was put well on notice by PCF's attorneys that the Mayer Brown opinion rested upon factual inaccuracies. For example, in an email exchange between Simon Root and Jon Sabes on December 22, 2001 (notably also *after* the deal closed), Root recounted an argument that Heather Thayer had with a lawyer at Mayer Brown, and he re-expressed her concern to Sabes over the documentation being structured "as a receivable financing, even though it is far from a traditional receivables financing in so far as the right to payment is not yet earned at the time of the financing." Root Email ¶ 3, Exh. PCF_050.0001. On December 26, 2001, Thayer emailed Opportunity Finance's

counsel at the Moss & Barnett law firm of Minneapolis, to express her disagreement with Mayer Brown's non-consolidation opinion due to its reliance on a "fact pattern [that] was lifted from some other transaction...." PCF_051.0001. According to Thayer's deposition testimony, she expressed her concerns about the "factual underpinnings" of the Mayer Brown opinion to Jon Sabes. Thayer Depo., 141.[62]

The third reason is that the Mayer Brown opinion listed 12 indicia of SPE separateness that it *assumed PCI and PCF did and would continue to maintain,* without any verification of them. Exh. OF_010_0008–_010_0010.[63] It makes little sense to posit that Opportunity Finance could rely on this threshold *assumption* for purposes of believing the entities were separate.

The same analysis can be applied to any purported reliance on the Andrews Kurth non-consolidation opinion, which was given in connection with the WestLB–Opportunity Finance senior lending transaction. For instance, in March 2005, Andrews Kurth provided an opinion that was partly based on the *assumption* that "Lender is relying on the separate existence of each of each of SPE and Seller in entering into the Transactions and Lender believes that it would be harmed if such separate existence were not recognized." Exh. OF_001_0003. On its face, but in context, this statement has a certain syllogistic character. It was unreasonable for Oppor-

---

**61.** The opinion of the DZ Bank–Opportunity Finance facility will be discussed below regarding DZ Bank.

**62.** Tom Petters eventually certified the truth of the assumptions of the Mayer Brown non-consolidation opinion regarding PCI's conduct. Thayer Depo., Exh. 5; Exh. PCF_053. There is no explanation in the record as to why or how this certification was justified.

**63.** These indicia include: maintaining a separate mailing address; maintaining a separate location of business operations; PCF paying all of its own operating expenses and liabilities from its own funds; not pooling PCF's funds (or other assets) or liabilities with those of PCI or any other entity; maintaining corporate formalities; no party holding itself out to be responsible for the debts of the other; etc. Exh. OF 10_0008–10_0010

tunity Finance and WestLB to have relied on this assumption toward concluding that the entities were separate.[64]

Fourth, Opportunity Finance failed to perform due diligence for the ostensible transactions through PCF for which it was providing financing, which made its reliance more unreasonable. Opportunity Finance never confirmed that the funds flowing into PCI in fact came from retailer-customers. This allowed the fraud to continue. In 2003 Jon Sabes did hire a private investigator to determine whether the retailers listed on the receipts provided by Petters had accounts at the banks listed on the receipts. Hrg. Tr. 430:3 to 431:12. While he considered this to be due diligence on Opportunity Finance's part, his testimony and Exh. PCF_105 show that the private investigator could only confirm that the supposed retailers (named as BJ's, Rex Stores, and Wal–Mart) had accounts at the banks noted. He could not confirm whether the supposed retailers were the holders of the specific accounts identified on the (forged) receipts furnished by the Petters operation. Hrg. Tr. 430:3 to 431:12; Exh. PCF_105.

Despite the investigator's inability to confirm that the ostensible retailers actually made the payments, Opportunity Finance never contacted any of the retailers for verification. Jon Sabes testimony, Hrg. Tr. 500:18–20. Toward an excuse, Jon Sabes testified that Opportunity Finance was barred from doing so unless there was a default under the Credit Agreement, and that Tom Petters had warned Opportunity Finance against doing so. Hrg. Tr. 432:3–8.

But, when PCF did default in 2007 or 2008, Opportunity Finance still did not contact any retailers. Hrg. Tr. 432:9–17. Instead, Opportunity Finance accepted PGW's stock in Fingerhut in lieu of exercising its rights under the Credit Agreement. Exh. PCF_147; Exh. PCF_001.0038.[65]

Under the core disciplines McKinley described, a reasonable provider of purchase order financing would not bargain away its ability to verify purchase orders, or defer exercising such a right on the dissembling that Tom Petters gave and the Sabeses accepted. In connection with that, the Mayer Brown opinion specifically imposed the following condition on its non-consolidation opinion: "For the purposes of this opinion, we have assumed ... there has been no (and there will not be any) fraud in connection with any of the Transactions." Exh. PCF_004.0003. Thus, the qualifications to the Mayer Brown opinion placed the onus on the parties to verify any circumstance potentially going to the existence of fraud. Simply accepting Tom Petters's blandishment was not reasonable, particularly with respect to the assumption that there was not a fraud.

Fifth, Opportunity Finance became aware of various red flags, which made unreasonable any further reliance on the supposed separateness of PCF. One red flag (related to the lack of due diligence noted above) is that Opportunity Finance was denied leave to [66]—and then did not—

---

64. It is also odd that Mayer Brown did not provide the later non-consolidation opinion. The resort to a different law firm, Andrews Kurth, is not explained.

65. The actual forbearance agreement does not appear to be in the record for this motion. It is an exhibit [G] to the Trustee's complaint

against Opportunity Finance, in Adv. No. 10–4375.

66. The lending documents did not require Opportunity Finance to obtain Tom Petters's leave to make such inquiries. Paragraph 3(c) of the Security Agreement permitted the Lender (Opportunity Finance) to make such

verify the authenticity of the purchase orders or the existence of the alleged inventory of goods.

In fact, verification seems not to have become an issue until DZ Bank pressured Opportunity Finance. For example, prior to a March 2003 meeting with DZ Bank, Jon Sabes relayed to Tom Petters a list of inquiries that DZ Bank was likely to make, one of which was, "How can DZ get satisfied with the existence and condition of inventories?" Exh. PCF_080.0001–_080.0004. Sabes described this inquiry as "not insurmountable, but somewhat problematic," and termed the problems as the "GE problems." PCF_080.0004.[67] Sabes also highlighted the physical location and existence of inventory as likely subjects for inquiry by DZ Bank, and he assigned the verification of inventory existence to the "aggregator's [i.e., Nationwide's or Enchanted's] responsibility." Exh. PCF_080.0003.[68]

Significantly, by April 2004 Jon Sabes learned that it might be possible to check the status of purchase orders on the website of Sam's Club (an ostensible PCI customer), as long as one had a vendor number. Exh. PCF_113. Deanna Coleman testified that Sabes's inquiry about this caused her concern because—contrary to representations made to Opportunity Finance—Sam's Club had never made *any* diverting-transaction purchases through PCI or its affiliates. Coleman Testimony, Hrg. Tr. 66:8–67:14. Coleman forwarded Jon's email to Tom Petters and heard nothing further from him. *Id.* at 67:4–6. Later, in September 2007, Jon Sabes emailed Coleman an attachment regarding the proper conventions of form and content for Sam's Club purchase orders, and he noted that "our deals from Sam's do not conform to this convention. Any thoughts?" Exh. PCF 141.[69]

But notwithstanding these several contradictory signs relating to purchase orders and inventory on ostensible PCF transactions that Opportunity Finance was funding, Opportunity Finance continued to lend to PCF until at least November 2007. *See* Exh. OF_032_0013 (showing a promissory note dated Nov. 28, 2007).

Another, major red flag was raised when Opportunity Finance was unable to get the Petters side of PCF financing transactions to stop its use of commingling, even though the Sabeses knew that commingling threatened any claim of separateness. From the Mayer Brown opinion, Opportunity Finance knew that commingling of assets is generally viewed as a negative factor on separateness, i.e., weighing in favor of substantive consolidation. Jon Sabes Testimony, Hrg. Tr. 419:4–12. However, only one month after closing the PCF and DZ Bank deals, Jon Sabes ac-

---

inquiries in their own name, at any time, as to the existence of Accounts, Contracts, Instruments of Chattel Paper. *See* OF_22_006 [subsumed within PCF_002]. Nonetheless, the Sabeses accepted Tom Petters's blandishments, that such probing could upset the delicate relationships he was trying to maintain with participants in the rapid-fire environment of diverting.

**67.** The reference here, obscure in import, is apparently to the General Electric Capital Corporation, which had provided financing to PCI in earlier years.

**68.** This exhibit was received subject to a hearsay objection, but that objection is overruled. This exhibit was not offered for the truth of the matter asserted by its content, but instead to show what Sabes believed to be DZ Bank's potential questions, and to show that Sabes believed the vendors, not Opportunity Finance, were obligated to ensure the existence of the inventory.

**69.** Sabes testified that he talked to Petters about this, but his testimony as to what Petters told him is hearsay.

knowledged the presence of commingling in the post-lending flow of funds within the PCI structure, in a January 31, 2002 memorandum to Deanna Coleman. Exh. PCF_056.0001. Later, in July 2002, Jon Sabes informed Coleman that Grant Thornton required more information about PCI for its audit of the DZ Bank facility, including a possible warehouse walk-through inspection. But for that, he instructed Coleman, "One thing, unless directly questioned, do not bring up the fact that retailer payments are not sent directly to the PC Funding account. I[f] asked answer honestly." Exh. PCF_062.

Sabes testified that he gave this instruction because he did not want retailer payments highlighted in the audit report to DZ Bank. Hrg. Tr. 473:3–9. Over one year after closing, in January 2003, Opportunity Finance and DZ Bank ultimately tried to establish a lock box account to prevent the flow of funds into PCI because of the following "legal concerns": (1) "less risk of fraud by Petters Company"; and (2) "More that commingling of funds in a Petters Company general account exposes the lenders to the risks that their funds may be at risk as of the day Petters Company declares bankruptcy for funds in the Petters Company general account because of traceability problems." Thayer Depo., Exh. 37; Exh. PCF_074.0002; Thayer Depo., 149–150. Under the new lock box proposal, a trust was to be created at a bank to ensure the proper flow of wired funds. However, contemporaneously Simon Root and Jon Sabes were discussing the "need to work through traceability of proceeds—is it always clear which

payments relate to which deals?" Exh. PCF_074.0004.

Thus, from the inception of the PCF credit arrangement Opportunity Finance knew that commingling could undermine PCF's separateness; yet when it was occurring Opportunity Finance did not require the Petters side to fix the problem, and Opportunity Finance continued to make loans to PCF for the duration.

### PCF (DZ Bank)

DZ Bank, as senior lender to Opportunity Finance on the PCF facility, did not rely on the separateness of PCF when it made loans to the Opportunity Finance SPE.[70]

The evidence establishes that DZ Bank relied on the credit of PCI. For example, at the inception of the Opportunity Finance–PCF arrangement in December 2001, *DZ Bank* required that PCI participate in the underlying diverting purchase, i.e., fund at least 2% of each purchase, so that no transaction was 100% debt-financed by the new PCF facility. Letter from Simon Root to Jon Sabes ¶ 3, Exh. PCF_42.0002. DZ Bank also required that it have limited—but direct—recourse against PCI in an amount not to exceed 2% of the maximum facility amount. Exh. PCF_061.0021. DZ Bank considered this limited recourse to be a "credit enhancement" for the loan facility between it and Opportunity Finance. PCF_038.0002.

In addition, prior to closing its arrangement for senior lending to Opportunity Finance, DZ Bank reviewed a February 2001 Arthur Andersen "Report on Financial Due Diligence," which "verified" that

---

**70.** DZ Bank objected to the Trustee's motion, and was accorded standing as an objector over the Trustee's motion. However, it maintained a passive stance at the hearing; it did not present any evidence in its own right, on the issue of reliance. And to explain the reference: Jon Sabes himself formed another

SPE on the Opportunity Finance side of the PCF credit relationship, as nominal disburser to SPF. It was never quite explained why stacking in another layer of entity served any purpose, other than enhancing abstract distance in the separateness sought.

PCI had received payments from particular buyers for all fiscal year 2000 transactions, and that PCI was current on its obligations to each of its creditors. PCF_038.0022_038.0030. DZ Bank actively monitored PCI's credit-worthiness after the deal closed, and while DZ Bank served as senior lender. For example, an internal May 2002 DZ Bank memorandum shows that DZ Bank reviewed a 2002 PCI balance sheet, a 2002 PCI profit and loss statement, and an April 2001 Arthur Andersen audit of PCI. Exh. PCF_038. According to Francine Farragher, DZ Bank analyzed PCI's financial status to ensure that it had "a significant net worth or enough net worth to finance" the percentage that it was guaranteeing or putting into the facility. Farragher Depo., 62:22–25, Exh. PCI 034A. However, in the meantime, DZ Bank did not require financial statements *of PCF*. Farragher Depo., 91:16 to 92:3, *Id.*

Even if DZ Bank relied and continued to rely on just one entity, i.e., PCI, such reliance was unreasonable and became more so. DZ Bank learned of certain defaults under its Security Agreement, but kept the senior lending facility open. In particular, DZ Bank knew that funds identified as retail customer payments flowed through PCI despite the requirement that retailer payment be made directly to PCF. Even though Jon Sabes tried to hide the issue from DZ Bank (as noted previously), DZ Bank discovered in April 2002 that ostensible retailer payments were being deposited in PCI's general operating account—in breach of its Security Agreement with Opportunity Finance. Exh. PCF_079.[71] An August 2002 internal "due diligence" memorandum also noted this. *See* Exh. PCF_064 [72] (noting that "all monies are going through the Peters Opperating Account [sic] prior to being transfered [sic] to the PC Funding Account {Peters [sic] SPV}. Additional testwork needs to be conducted to determine whether Peter's [sic] is capitalizing on the float").[73]

In January 2003, DZ Bank finally notified the Sabeses that Opportunity Finance was in breach of its Security Agreement, due to the flow of funds issue. Exh. PCF_073.[74] The issue was never resolved, and DZ Bank ultimately exited the senior lending facility with Opportunity Finance

---

71. PCF_079 was received subject to objections of record and can only be used against DZ Bank, but DZ Bank's objection list does not list PCF_079. *See* 08–45257 [dkt. # 1540]).

72. PCF_064 was taken subject to a hearsay objection. The objection is overruled, because the document was not offered to prove that the funds did in fact go through the PCI account, but to prove that DZ Bank had the understanding that the funds were going through the PCI account.

73. Around this time, in September and October 2002, Jon Sabes and Deanna Coleman tried to figure out how to appease DZ Bank's concerns about the flow of funds. In a September 2002 email exchange between Sabes and Coleman, Sabes told Coleman that they needed to figure out how to make retailer payments flow directly to PCF in order to appease DZ Bank. Coleman suggested paying off DZ Bank if it was dissatisfied because she "still [couldn't] think of anything that would work for everyone." PCF_067. Sabes later proposed a "fix" to the commingling issue in an October 2002 memo to Tom Petters. PCF_068. In that memo, he noted one concern: "if a catastrophic event were to occur at Petters there is potential for much confusion as to whom has what rights to what payments." *Id.* ¶ 1.

74. Pursuant to a stipulation as noted on the record, PCF_073 may only be used against DZ Bank, and the Court is to consider DZ Bank's objections made on the record during the Farragher deposition. However, DZ Bank did not raise *any* objections to this exhibit during the deposition, at the hearing, or in any filing.

after an insurance downgrade and poor results from due diligence investigation made continued involvement unattractive.

DZ Bank's reliance was also unreasonable due to inadequate due diligence on its part. Heather Thayer gave her quick take on DZ Bank and its risk-management practices by opining to Simon Root that DZ Bank was an investment bank, "so the chance that they'd be checking on the collateral is nil." Exh. PCF_043.0001. To be sure, the Security Agreement for the senior lending facility did name Opportunity Finance as the Servicer, with authority to "service, administer and collect Pledged Receivables," Exh. PCF_006.0040; and as Servicer, Opportunity Finance was charged with, among other things, the "duty" of "policing the collateral." Security Agreement with DZ Bank, § 6.01(b), PCF_003.0074.

But even with that duty assignment, DZ Bank had the right under the Security Agreement to "contact any or all Opportunity Loan Borrowers [i.e., PCF] with respect to any Receivables which are Pledged hereunder in order to procure such information related to any or all such Opportunity Loan Borrowers, the related Contracts, and the Receivables," up to twice each calendar year (or as frequently as desired in the event of a "Default"). Security Agreement § 6.13(b), Exh. PCF_006.0085.[75] Significantly, prior to opening its facility for Opportunity Finance, DZ Bank knew that Opportunity Finance "does not normally perform any notification procedures with the Buyer or Seller to verify the purchase order." Exh. OF_006_0116. Thus, DZ Bank could not have reasonably expected Opportunity Finance to consistently or adequately verify purchase orders even given its formal policing duties as Servicer.

As it turns out, DZ Bank made an inquiry regarding the inventory on one instance. It did not go well. A March 20, 2003 internal memorandum recounted a meeting between DZ Bank, Opportunity Finance, and Tom Petters: "I have requested copies of the shipping documents whereby the goods that were sold to Petters Company and ultimately sold by Petters Company. As of May 21, 2003[sic], these documents have not been delivered. I have not examined documentation to support payment of the invoices in my [test] selection. . . . Mr. Petters would not disclose who comprised the supply chain of the goods that he purchased from the approved vendors." Exh. PCF_081. Within a month, DZ Bank's senior lending facility for PCF transactions would be wound down—partly due to this failure of verification. In memorializing that from a quarterly review of the facility, DZ Bank noted:

> An on-site due diligence review was conducted on March 19, 2003, at the offices of both Opportunity Finance and Petters. During our review, discussions were held regarding the goods "chain of ownership" in order to ascertain that evidence pertaining to the sale and delivery of goods was available and accurate. Based on discussions with Tom Petters, we were informed that the inventory is purchased from an approved manufacturer as defined in the RLSA. Evidence of this purchase was reviewed for a sample of receivables, without exception. *While it was never contem-*

---

**75.** The Security Agreement defined "receivable" as "the right to receive all payments from an Opportunity Loan Borrower [i.e., PCF] . . . including, without limitation, any right to the payment with respect to (i) any proceeds arising in respect of any Opportunity Loan Collateral or any Subject Inventory Collateral related to such Opportunity Loan. . . ." Exh. PCF_006.0038.

*plated that inventory would be physically verified at the warehouses, ASG determined that this inability coupled with the downgrade of RSA [the insurance company], and the failure of funds to be deposited directly to a lockbox (as identified during prior site review) presented ASG with risks that were unacceptable for the program.* In May, Opportunity Finance began winding down the facility. It is anticipated that the facility will be paid in full by August 2003.

Exh. PCF_101.0004. The sequence of events established by this evidence shows that, had DZ Bank pushed to verify the collateral much earlier and more firmly as a diligent purchase order financer would have, it would have revealed an unmistakable red flag that could not reasonably be ignored—all per McKinley's due diligence disciplines.[76]

### PCF (WestLB)

Two years after DZ Bank closed its credit facility for PCF, WestLB became the senior lender to Opportunity Finance.

Like DZ Bank, WestLB partially relied on PCI's credit-worthiness. Matthew Tallo testified that WestLB relied on the separateness of both the Opportunity Finance SPE (Opportunity Finance Securitization III) and PCF. Hrg. Tr. 594:2–8. However, he also testified that, before closing the Opportunity Finance deal, WestLB reviewed *PCI's* financial statements "to make sure" PCI had "financial wherewithal" and "financial standing." Hr. Trans. 612:14 to 613:8.

Notably, WestLB also had information at its disposal that confirmed that PCF and Opportunity Finance both viewed PCI as a source of payment should ostensible retailer-customers default. For example, WestLB had required independent audits of PCF. Matthew Tallo Testimony, Hrg. Tr.: 607:19–22. In one financial statement, the auditors asserted that "[a]n allowance for uncollectible accounts.... [was] not considered necessary" because "[t]hese accounts receivable are purchased with recourse; therefore, the related party [i.e., PCI] bears the risk for uncollectible accounts." Exh. PCF_106.0011. Thus, WestLB knew that the backup presence of PCI was integral to the viability of the PCF facility; that is why it inquired about and evaluated PCI's "financial wherewithal."

WestLB's failure to conduct due diligence renders any reliance on separateness unreasonable. The Security Agreement between WestLB and Opportunity Finance was essentially the same as that between DZ Bank and Opportunity Finance; Opportunity Finance was again named Servicer with the duty of "policing" the collateral. Security Agreement § 6.01(b), Exh. PCF_007.0061. Tallo testified that WestLB relied on the Servicer "for policing and monitoring the collateral." The result of that was that information from Opportunity Finance "is pretty much the only information we have relating to the actual performance of the receivables and the collateral." Hrg. Tr. 592:9–12, 18–23.

Actually, WestLB never verified collateral beyond requiring assurance from the

---

**76.** There is a bit of evidence to suggest that DZ Bank became suspicious—or actually knew—of untoward activity within the Petters operation shortly before the March 19, 2003 due diligence investigation. In a March 7, 2003 email, Patrick Preece of DZ Bank inquired about Jon Sabes' contribution to the transactions. Exh. PCF_107. There, he noted, albeit without much context, "Ken's worry is that Jon is putting in his capital and then sence [sic] *he is 'in on' the fraud,* he receives the money back out and Jon has no REAL equity in the deal." *Id.* (italicized emphasis added).

Petters organization of the existence of the ostensible receivable from a customer. *Id.* 605:5–15. Even so, like DZ Bank, WestLB had the right to "contact any or all Opportunity Loan Borrowers [i.e., PCF] with respect to any Receivables which are Pledged hereunder in order to procure such information related to any or all such Opportunity Loan Borrowers, the related Contracts, and the Receivables," up to twice each calendar year (or as frequently as desired in the event of a Default). Security Agreement § 6.13(b), PCF_007.0071.[77] In turn, even though Opportunity Finance was generally in charge of policing the collateral, WestLB had the authority to contact PCF directly to inquire about the collateral. Like DZ Bank, these empowerments make it less credible for WestLB to assert its reliance on Opportunity Finance as its Servicer as an excuse for failing to engage in any of the due diligence disciplines itemized by McKinley. This is especially underlined by the continual expressions of doubt about the PCF credit facility that one of WestLB's own employees made, before it closed the account. Hrg. Tr. 615:12–19.[78]

WestLB was also unreasonable in its reliance on the March 2005 Andrews Kurth non-consolidation opinion for PCF. The Andrews Kurth opinion *assumed* that "Lender is relying on the separate existence of each of SPE and Seller in entering into the Transactions and Lender believes that it would be harmed if such separate existence were not recognized." Exh. OF_001_0003. If Andrews Kurth assumed separateness as the de facto predicate to such reliance, then WestLB could not have reasonably relied on the firm's opinion toward concluding that the entities were separate. Beyond that, the Andrews Kurth opinion also assumed that various "facts . . . will remain accurate in all material respects," including the following: PCF will not commingle its assets except to extent contemplated (the 24–hour period); PCF will maintain separate books and records; PCF will pay its own liabilities and the salaries of its employees with its own funds; PCF will observe all corporate formalities; PCF will maintain its own office space and allocate for any overhead shared with PCI. Exh. OF_001_0008–_0009.

WestLB could not have reasonably relied on this opinion without some effort to verify the assumptions that qualified the opinion. The record has already established that many of the assumptions were never realities.[79]

### PL (Epsilon/Westford)

The Epsilon/Westford parties did not rely on the separateness of PL. Instead,

---

**77.** The Security Agreement defined "receivable" as "the right to receive all payments from an Opportunity Loan Borrower [i.e., PCF] . . . including, without limitation, any right to the payment with respect to (i) any proceeds arising in respect of any Opportunity Loan Collateral or any Subject Inventory Collateral related to such Opportunity Loan," etc. Exh. PCF_007.0031.

**78.** In its written closing argument, WestLB highlights Tallo's testimony that, in his 20 years of experience, it had never been his practice as a lender to confirm the existence of any goods that were associated with a receivable or a purchase order in this sort of financing. WestLB Closing Arg. Brief, 7; Hrg. Tr. 605:8. But because Tallo was *not* an expert witness, his experience-based opinion offers nothing in terms of establishing an industry standard. The testimony merely corroborates that WestLB never did verify the existence of collateral, de facto.

**79.** For example, Coleman testified that the SPEs did not maintain separate office space, did not have their own telephone lines or email addresses, did not convene any board meetings, and allowed PCI to pay their expenses. Hrg. Tr. 47:24 to 49:6; *see also* Exh. PCI_011 (showing that PCI paid PCF's accounting expenses in June 2007).

they relied on the interrelatedness of PL with PCI and, potentially, other entities in the Petters structure.

First, Epsilon/Westford considered the guarantees by Tom Petters and PCI as necessary "credit enhancements" for the PL facility. Stevanovich Testimony, Hrg. Tr. 704:12–16. Second, PL never had an independent director during Epsilon's tenure as a lender from 2001 to 2005. There is no evidence that the Epsilon/Westford parties sought the appointment of an independent director. Exh. PL_EP_001.0036. Third, PCI usually represented that it had an equity or participation interest of 10–30% in the various transactions through PL. Emami Testimony, Hrg. Tr. 760:11–15. Fourth, the Epsilon/Westford parties filed a financing statement against PL *and PCI* to put all of *PCI's* creditors on notice of Epsilon/Westford's place in relevant debt structures. Stevanovich Testimony, Hrg. Tr. 704:8–11.

Finally, and very significantly, the Epsilon/Westford parties relied on the interrelatedness for repayment. For example, in one email exchange between Coleman and Camille Chee–Awai (then an Epsilon employee), Chee–Awai asked Coleman to wire $1,119,754 to PL's Highland Bank account. Coleman replied that she would not be able to do so on that particular day without a payment from National, but Coleman nevertheless assured that the requested funds would be wired to the Highland Bank account by the next day *even if payment did not come in from National.*

Exh. PL_EP_46. Neither Chee–Awai nor anybody else from Epsilon questioned the fact that funds in repayment would be coming in on this loan from *some* source that was not tied to the underlying note and purchase order. Coleman Testimony, Hrg. Tr. 90:15–19. In another exchange from 2003, Emami understood that Coleman was still awaiting a $1.1 million payment from a retailer for "Loan 21," but asked Coleman whether she could wire the $1.1 million to the Highland account *even if the payment did not come in from the retailer.* Exh. PL_EP_047.[80] At the hearing on this motion, Emami admitted that he had expected the funds to be supplied by a *capital infusion by Tom Petters as the owner or by an inter-company payment.* Emami Testimony, Hrg. Tr. 761:11 to 762:9.

Moreover, any reliance on the separateness of PL by the Epsilon/Westford parties was unreasonable because they did not conduct adequate due diligence. They were on notice of various red flags, and they even allowed defaults under the Master Loan Agreement.

As for the lack of due diligence, Epsilon/Westford had hired Arthur Andersen to conduct a due diligence investigation of PCI prior to investing in PCI and PL because there were no audited financials to review. Stevanovich Testimony, Hrg. Tr. 686:17–22, 687:1–14; Arthur Andersen Report, Exh. EW_082. However, the Arthur Andersen firm noted that it had limited its

---

**80.** Emami testified that he was requesting PL to make payment because Loan 21 was due. That makes little sense in light of the circumstances. By this time, Epsilon already knew that ostensible payments from retailer-customers were wired to PCI's M & I account and then to PL's Highland account. In fact, Epsilon had control over the Highland account, which housed all of PL's funds. Thus, the Emami and Chee–Awai emails seem to demonstrate that Epsilon turned to PCI when the notes were due, because Coleman controlled the flow of funds from PCI to the Highland account. Although Coleman was the "Secretary" of PL (*see* EW_34_0001), she controlled the flow of funds into and out of PCI's M & I account. The remaining testimony from Emami as to his expectation of getting the benefit of inter-company payments and capital infusions by Tom Petters and his entities buttresses the conclusion.

investigation procedures *at the request of Epsilon/Westford,* such that it could not express opinions about PCI's internal control over financial reporting, nor make representations concerning the "accuracy and completeness" of the financial information upon which it relied in generating the report. Arthur Anderson Report, Exh. EW_082_0003. The Arthur Andersen report also recites that the firm understood Epsilon/Westford to have been responsible for performing an "operational evaluation" of PCI, including "the capabilities, competitive sustainability or currency of technology matters," as well as an investigation of PCI's "financial projections" and "revenue estimates." Arthur Anderson Report, Exh. EW_82_0003.

Notably, Epsilon/Westford never required an audit of PCI or PL. Stevanovich Testimony, Hrg. Tr.: 691:4–11. Nor did Epsilon/Westford seek non-consolidation or true-sale opinions. *Id.* 713:10–23. Instead, Epsilon/Westford got "comfort," i.e., formed its reliance, on the fact that General Electric Credit Corporation had previously lent to the Petters operation, because GE was known in the industry for performing extensive due diligence. *Id.* 683:6–15. Epsilon/Westford was also "comforted" by the mere presence of Theodore Mondale within the Petters organization. *Id.* 683:16–23.

Notably, Epsilon/Westford never contacted any ostensible retailer-customers of PCI; nor did it ever contact GECC or inquire later as to why GECC abruptly terminated its relationship with PCI. *Id.* 715:10–20; 711:13 to 712:7. Mere comfort from the presence of other lenders in the debt structure of a prospective borrower does not constitute due diligence under the standards McKinley attested to. The minimal report by Arthur Andersen did not do enough under any of the McKinley principles. The closest Epsilon/Westford ever came to real due diligence of a direct and palpable sort was an October 2005 email in which Epsilon/Westford's attorney asked Deanna Coleman about "the location of the collateral" for a particular transaction. Exh. PL_EP_065.

The presence of red flags made known to Epsilon/Westford further undermines the reasonableness of its reliance on separateness, if any. Inaccuracies appeared on the face of proffered ostensible purchase orders. Various communications contained discrepancies regarding PCI's required equity interest in the transactions. The following examples show that Epsilon/Westford noticed such inaccuracies from 2002 to 2006:

1. Amir Emami monitored the note transactions on an ongoing basis. Emami Testimony, Hrg. Tr. 747:5–24. By at least October 2002, Emami noticed that various purchase orders from Petters conflicted with each other. Exh. PL_EP_042.

2. In a 2003 email, Epsilon's attorney alerted Coleman that a particular purchase order erroneously listed Thousand Lakes as the issuer instead of PL. Exh. PL_EP_052.

3. In a 2004 email, Epsilon's attorney asked Coleman to "edit" another purchase order that had erroneously listed an issuing entity other than PL. Exh. PL_EP_054.

4. In a February 2005 email, the attorney again asked Coleman to revise a purchase order to make PL the issuing party rather than PCI. Exh. PL_EP_057.0002.

5. In July 2005, the same attorney asked for the same revision regarding a purchase order issued to Enchanted. Exh. PL_EP_061.

6. In a January 2005 email to Robert White, Epsilon's attorney noticed that the purchase order from the ostensible

retailer-customer (Sam's Club) to PCI did not match the corresponding purchase order from PL to Nationwide (the ostensible vendor). Exh. PL_EP_056.

7. In a February 9, 2005 email, the Epsilon attorney noticed another discrepancy between the Item Number on the purchase order issued from PL to Nationwide and the Item Number on the purchase order issued from BJ's (the ostensible retailer-customer) to PCI. Exh. PL_EP_058.

8. The attorney brought the same concern to Coleman's attention on February 28, 2005. Exh. PL_EP_059.

9. In another email, the attorney continued to note various discrepancies between the items listed on purchase orders to the ostensible vendor and the items listed on the corresponding purchase orders from the ostensible retailer. Exh. PL_EP_062.

10. Emails of this sort of content continued to go from Epsilon's attorney to Coleman until at least October 24, 2006. Exhs. PL_EP_066 to PL_EP_070.

Also, while PCI was usually required to have a 10–30% equity interest in the transactions, Epsilon/Westford noticed various discrepancies that called into question the actuality of PCI's equity or participation. For example, in a May 2003 email, Epsilon/Westford's attorney asked Coleman to fax him "evidence of Petters portion of the wire." Exh. PL_EP_049. In a September 2004 email, Epsilon's attorney noted discrepancies between the total cost of the vendor's goods and the total amount of the wired funds to purchase those goods, particularly the miscalculation of the funds to be wired from PCI. Exh. PL_EP_055. A similar discrepancy was noted in emails to Coleman in August and September of 2005. Exh. PL_EP_063, _064.

There is no evidence that Epsilon/Westford did anything but bring such inaccuracies in purchase-order documentation to the attention of Coleman and White. Those two happened to be the creators of the inaccuracies, in the Petters organization's division of labor for the scheme's operation. A reasonable lender would not have continued to make loans in light of the persistence and continuity of these red flags, at least not without a deeper investigation and the right sort of assurances in its results.

### PL (Elistone)

In hindsight, it is clear that PL was always interrelated with PCI. However, when Elistone Fund ("Elistone") became a lender, PL was more structurally separate than any of the other SPEs discussed here, at least to a degree. For example, there were no guarantees by PCI or Tom Petters. Prior to lending to PL, Elistone required PL to add an independent director. Exh. PL_EP_001.0037. Elistone did actually rely on the supposed separateness of PL. Ohad Egoz Testimony, Hrg. Tr. 773:20–25, 779:3 to 780:11, 801:23 to 802:2. There is no evidence that Elistone looked to the credit of, or sought payment from, any other Petters entity—unlike other SPE-related lenders.[81]

---

81. The Trustee makes much of the fact that Elistone has filed proofs of claim against each and every one of the Debtors in these cases based on its assertion of joint liability under an alter ego theory. Exh. PL_EL _001.004.0001–_001.004.0063. At most, this reflects that Elistone regarded the entities as alter egos at the time it filed the proof of claim, a position that may well have been a matter of hindsight and damage control post-bankruptcy. For this motion, the focus is on Elistone's understanding at the time it bought the notes (i.e., made the loans) or otherwise engaged in some type of "reliance" toward contracting or lending. Thus, the inferences that may be drawn from the proofs of claim are irrelevant for this motion.

Even so, and again due to its inadequate due diligence, Elistone did not *reasonably* rely on PL's separateness.

Like DZ Bank and WestLB, Elistone relied on others to perform much of the due diligence, or relied on the past performance of due diligence by others. First, Elistone relied on Arrowhead Capital Management LLC ("Arrowhead") as its Master Servicer under the Note Purchase Agreement with PL. Exh. PL_EL_001.0011; PL_EL_001.0068. Elistone had no previous asset-backed financing experience. It regarded Arrowhead as an expert in the field. Egoz Testimony, Hrg. Tr. 775:3–19. Elistone even used Arrowhead's documents as a template for structuring its relationship with PL. While Elistone did make some changes to the template (e.g., adding more assets as collateral under the Pledge and Security Agreement, Hrg. Tr. 778:19 to 779:2), it copied the procedure used by Arrowhead that allowed funds for its repayment to flow through PCI before reaching the SPE account. Egoz Testimony, Hrg. Tr. 783:24 to 784:14.

As it turns out, Elistone now believes that it was defrauded by Arrowhead and PL. Egoz Testimony, Hrg. Tr. 775:3019, 811:18–24.[82] Notwithstanding that, however, Elistone could have performed more of its own due diligence, to hedge against two levels of risk inherent in the relationships. Under Section 5 of the Pledge and Security Agreement, Elistone had the right "to verify any accounts in the name of [PL.] or in [Elistone's] own name...." Exh. PL_EL_001.0060. While Elistone had on-line access to PL's collateral account at Wells Fargo, such access did not provide information regarding the source of funds. Stipulation on the Record, Hrg. Tr. 819:14–25; Egoz Testimony, Hrg. Tr. 796:16–18. Egoz testified that Elistone never contacted any of the supposed retailer-customers, except for Wal–Mart, and that contact was only made after the FBI raid. Hrg. Tr. 830:2–4, 836:7–10. Instead, Elistone expected the insurers to make inspections and to make certain that the goods existed and were in good condition. Egoz Testimony, Hrg. Tr. 838:5–11.

A reasonable purchase-order lender in Elistone's position would have performed at least some of the disciplines itemized by McKinley, especially since Elistone explicitly required goods purchased to be "new in-the-box" electronics. Egoz Testimony, Hrg. Tr. 838:5–11.

Further, Elistone's failure to evaluate PL's capitalization made any reliance on PL's separateness unreasonable. Without any analysis of PL's financial standing, there was no way to know whether PL was capable of fulfilling its responsibilities independently of its parent's resources. Elistone evaluated the credit-worthiness of Sam's Club and the well-being of Wal–Mart, both of which were represented to it to be PCI retailer-customers. Exh. EF17; Exh. EF25. But that was not the inquiry material to Elistone's risk as a lender, or to its reliance on boxing all post-bankruptcy consequences of its lending into the separate shell of PL. PL was the borrower; a reasonable lender would have looked first to the credit-worthiness of PL. And *PL's* financial stability was the factor relevant to its ability to be and remain separate from PCI or other Petters entities.

**82.** James Fry of Arrowhead was indicted on various criminal charges, on the assertion that he worked with Frank Vennes of Metro Gem to fraudulently lure investors into the Petters scheme. Exh. EF65. Michelle Palm of Arrowhead pleaded guilty to securities fraud and false statements charges in connection with her work on behalf of Arrowhead. Exh. EF22.

Granted, Elistone retained Grant Thornton in July 2008 to perform an audit investigation of PL. But this effort came *after* the last loan and note associated with PL, and it was not even completed before the FBI raid. Egoz Testimony, Hrg. Tr. 800:1–6; EF56; EF27.[83]

### Conclusion, on *Ex Ante* Reliance

In sum, the evidence establishes one thing or another for all but one of the SPE-associated lenders: in lending to their SPEs, they actually did rely on their SPEs' close connections with PCI, the practical benefit of those connections, and PCI's availability as a credit-worthy source of cure on their SPEs' default; or that they actually reserved a direct, though secondary recourse against PCI as a term of their extending credit to PCI's related entities. On the record presented, Elistone is the only exception.

Within the framework of *Giller's* analysis, this active reliance on non-separateness separately supports consolidation as to those SPEs' estates, to bring the structure of entities under bankruptcy administration into line with those parties' original expectations toward their own benefit.

### 3. Benefits of Consolidation Against Harm to Creditors

██ *Giller's* second factor requires a weighing between two opposing considerations. Again, the consideration directed toward the estate is prospectively-oriented—how consolidation would enable a less expensive, more efficient, or more productive administration. The consideration directed toward opponent-creditors has its roots in pre-bankruptcy time—the expectancies established by contract and law—and only after that does it look forward, to how the effectuation of such expectancies would differ under consolidation from what would be had through separately-channeled treatment of debts and assets.

### a. Benefits

One of the more obvious benefits of substantive consolidation is that the Trustee would gain an argument to solidify his standing for avoidance proceedings, without incurring additional expenses (e.g., by having to litigate standing, to develop a theory addressing the issue of a predicate creditor, etc.), and the estates would lose the risk of an adverse ruling toward a loss of rights of avoidance against the "net winners" from the Ponzi scheme.

Citing *Owens Corning*, the objecting parties argue that substantive consolidation may not be used offensively, i.e., when the primary purpose is "to disadvantage tactically a group of creditors in the plan process or to alter creditor rights." Opp. Fin. Closing Arg. Brief, 7. But the theory of this argument, as based in that ruling, is inapposite. In the first place, *Owens Corning* is not precedent here. The fundamental rationales of *Giller* and *Owens Corning* are so different, based on such different policy and such variant conceptions of the use of the bankruptcy process, that it is just not appropriate to pluck one broad cautionary out of *Owens Corning* on the assumption that it fits into the posture of this case and within *Giller's* contemplations.

But assuming that it did, the basis for the fear is not present. The Trustee is not seeking to disadvantage the objectors in the confirmation process for a plan; at this

---

**83.** According to Egoz, the audit took a long time to come to fruition because Elistone relied on ArrowHead's assistance. (And Arrowhead and its principals started to have their own problems around that time.) Egoz testimony, Hrg. Tr. 833:18 to 834:13. The fact remains, though that Elistone still did not retain Grant Thornton until after the last note was issued.

point, there is no plan on file and it is impossible to predict how consolidation would affect its fate substantively. Further, the Trustee is not seeking to impair the objectors' rights as creditors. Rather, he seeks to enhance the distributions for all creditors. In that regard, a couple of things are worth noting.

Of all the objectors, only Elistone has filed proofs of claim. None of the others has yet affirmatively asserted a right to receive a distribution once sufficient assets are collected.

More broadly—and in a more global consideration—the claims registers for the PCI-related Debtors show that nearly all non-objector creditor-claimants have either filed an identical proof of claim against all of the estates of PCI and the SPEs or filed a proof of claim only against the PCI estate. *See* Addendum 1 to Trustee's Closing Arg. Brief (summarizing claims registers in the cases' records). This bears out the way the Trustee interprets these creditors' conceptions of their rights in the bankruptcy process. They are already looking to the collective estates (on a tacit or overt theory of joint and several liability in fraud, conspiracy, etc.), or to PCI's estate (perhaps on a notion of par-

ent-company or agency liability) for the right to distribution on their claims. This means that if the estates were consolidated, the creditor pool would be substantially similar to a non-consolidated administration, in composition and parity.[84] As for the objecting parties' rights as "creditors," according standing to the Trustee might actually give a basis for those parties to have status as "creditors" with a "contingent" claim under the Code.[85] Thus, substantive consolidation might well not alter the parity of any creditor's rights in distribution, in an inappropriately-disproportionate way.

### b. Harm

One of the possible harms of substantive consolidation is the dilution of the claims that creditors would otherwise have against a single non-consolidated estate, by the massing of creditors' claims against a consolidated estate.[86] However, nearly all of the creditors of the SPEs have filed identical proofs of claim against the estates of PCI and each of the SPEs. So, their current claims are probably close in proportion to what their claims would be against a consolidated estate. Given that, the other creditors of PCI most likely will not face a substantially-enlarged creditor

---

**84.** Several of the objectors make much of the fact that the SPE–Debtors' claim registers are devoid of any claims premised on the direct contractual liability of those particular debtors. This would be consistent with the entities' intended use as pass-throughs for financing purposes only. However, in itself it would not affect the validity of the filed claims that are premised on joint and several liability in tort, conspiracy, etc.

**85.** Most of the objecting parties subject to the Trustee's suits could be "creditors" as a result of their "contingent claims" under 11 U.S.C. § 101(5)(A). *See In re Dunes Hotel Associates,* 1997 WL 33344253, at *12 (Bankr. D.S.C. Sep. 26, 1997) (citations omitted) ("Under Section 101, creditors whose claims are potentially subject to avoidance already

have a contingent claim, 11 U.S.C. § 101(10)(B), for which they may file a proof of claim following entry of a final judgment of avoidance (Fed. R. Bankr.P. 3002(a)(3)), subject to disallowance if they fail to turn over the avoided property, and subject to immediate temporary allowance under Bankruptcy Rule 3018(a) for purposes of voting.").

**86.** The Trustee incorrectly argues in the alternative that "harm" is usually measured as to the entity that is being consolidated. Trustee's Closing Arg. Brief, 19 (quoting *Bonham,* 229 F.3d at 767). But unlike *Bonham, Giller* clearly measured the "harm" to creditors. *See Giller,* 962 F.2d at 799 (asking "whether the benefits of consolidation outweigh the harm *to creditors* ") (emphasis added).

pool in which they must participate pro rata. Because of the overlapping claims, substantive consolidation may result in only a small increase in the creditor pool.

And in any event, no objector has offered any quantified evidence of harm to any creditors' claims.

Elistone is the only creditor under a filed proof of claim that argues it would be directly harmed by substantive consolidation. Elistone asserts that it has a security interest in the proceeds of the Trustee's fraudulent conveyance and unjust enrichment claims pursuant to sub-clauses E ("all General Intangibles"), L ("all causes of action"), or M ("all Proceeds") of § 1 of its Security Agreement with PL. Exh. PL_EL_001.0053.[87]

The Trustee does not currently object to this rather bold assertion of secured status, but that is of no moment. It is a far stretch to assert that even a blanket security interest under an after-acquired property clause could extend past the boundary of bankruptcy, to attach to rights of action that did not even exist in the debtor's ownership.[88] And in any event Elistone is subject to meritorious challenge on this assertion, on an argument that it did not

properly perfect its security interest. This would moot the asserted harm.[89]

As for the objectors that did not file proofs of claim, the only potential harm from consolidation would be the loss of their standing defense in the Trustee's avoidance litigation. The argument here is that most or all of the SPE–Debtors had no creditors at all when they were put into bankruptcy, or their related lender was their only creditor (on any unpaid loans). This would mean that there was no predicate creditor from which the Trustee would derive standing to sue in avoidance.[90]

As noted above, however, the expansion of the Trustee's standing appears to fall right into the contemplation of *Giller* as more beneficial than harmful because it would enable an enhanced recovery that would increase the return to creditors. In any event, the potential conferring of standing as a consequence of consolidation merely submits the objecting parties to greater exposure to liability at the present time. The Trustee would still have to prevail on the transferred-standing issue and then on the merits. And finally, there

---

**87.** Elistone also argues that it is entitled to reimbursement of all expenses and attorneys' fees from PL, thereby possibly enlarging Elistone's claim against PL beyond just the clawback claims.

**88.** 11 U.S.C. § 552 has something to say to this, but that issue is *far* beyond the scope of this motion.

**89.** Elistone's financing statement described the collateral as: "All assets of every kind and description, whether now owned or hereafter acquired and wherever located, and all proceeds thereof." Under Article 9 of Minnesota's Uniform Commercial Code, a supergeneric description, such as "all the debtor's assets" or "all the debtor's personal property" or the like, "does not reasonably identify the collateral." Minn.Stat. § 336.9–108.

(Minnesota law controls because PL is a Minnesota corporation. Exh. PL_EL_001.0079; *see also* Minn.Stat. § 336.9–307 (confirming that the location of PL, for UCC filing purposes, is Minnesota).) Without a sufficient collateral description, Elistone's security interest never attached and became perfected. Minn.Stat. § 336.9–203(b)(3)(A). There is no evidence that any other "condition" under Minn.Stat. § 336.9–203(b)(3) is met.

**90.** Under the authority of several extant opinions, consolidation could overcome this defect by making any predicate creditor with a claim against any of the previously-separate estates, the creditor from which the Trustee would derive standing, post-litigation. *E.g., In re Bonham,* 229 F.3d at 765; *In re DBSI,* 447 B.R. 243, 246 (Bankr.D.Del.2011).

is the big-picture ground that defuses the righteousness of this thrust of the objectors' resistance to consolidation. *See* "In Closing," *infra.*

### 4. Prejudice Resulting from Not Consolidating

■ *Giller's* third factor is prospectively-oriented: it looks to how not consolidating would impair the estate's options for recovery of value for creditors, or limit its latitude in litigation.[91]

The Trustee correctly follows *Giller* and argues that failing to consolidate would be unduly prejudicial and inequitable. Trustee's Closing Arg. Brief, 21–22. The Trustee first emphasizes that the SPEs' only avenue for the recovery of potential value is the estates' avoidance claims. The Trustee argues that non-consolidation would impose substantial cost on the estates for litigation on standing for these claims. And if no argument for standing in a non-consolidated posture holds water, then the estates may not have any rights of avoidance; or novel and more remote theories may have to be pursued via the amendment of complaints.

There is another potential prejudice, on the administrative plane. The Trustee

points out that it would be extremely costly to resolve the 30–plus proofs of claim (totaling over $7 billion) asserted as to each SPE, on their assertions of joint and several liability with PCI for the same injuries. Apportionment of liability among them would be costly, even if jointly presented to the court as they would have to be to administer PCI's estate alone.[92] And the merits of those issues may prove to be an imponderable.

Costliness to the estates reduces the return to potential creditors. Therefore, creditors both actual and potential stand to benefit more from substantive consolidation. Non-consolidation would almost certainly diminish their overall return. To be sure, this is a different type of prejudice than that recognized in *Giller*, where particular estates without assets would have lacked the funding to pursue meritorious avoidance litigation in their own right if the debtors remained non-consolidated. However, it is a prejudice nonetheless. *Id.*[93]

The only prejudice to which the objecting parties' briefs elude is that substantive consolidation would unfairly apply to the creditors that originally essayed to treat a

---

91. Again, it is important to note that this stage in *Giller's* analysis presupposes a finding that there had been substantial pre-petition melding-in-fact among debtor-entities, as the platform from which to determine whether substantive consolidation should go ahead. Thus, as a matter of fairness, the mere consideration of the third factor does not run roughshod over the natural, reliable consequences to be had under law from the separateness of legal personality in corporations and individuals and an accompanying de facto observation of that separateness. A proponent of substantive consolidation must prove the substantial erosion or diminishment of that separateness as a matter of fact and law *first*, before an equitable override of the legal consequences of separateness is to be even considered.

92. The Trustee has already garnered substantial value into the PCI estate.

93. It bears reiteration that all of the objecting parties except Elistone (which has filed a proof of claim) are likely only "creditors" as a result of their "contingent claims" under 11 U.S.C. § 101(5)(A). Therefore, non-consolidation not only complicates the Trustee's standing in the clawback actions; it also jeopardizes the objectors' status as "creditors" under the Code. Perhaps the objectors would prefer it that way, as a matter of cost-benefit analysis coordinated with litigation strategy; but in that instance, they should not have been as sanctimonious in accusing the Trustee of overreaching for this remedy toward enhancing the *estates'* posture in the litigation.

debtor as a separate entity. Opportunity Finance Closing Arg. Brief, 7; Epsilon/Westford Closing Arg. Brief, 5–6. In the end, any such unfairness is inapposite in light of the evidence that showed that their reliance was unreasonable. Further, under *Giller*, the frame of reference is opposite: the resulting prejudice is supposed to be measured from *non*-consolidation. *See Giller*, 962 F.2d at 799 ("3) prejudice resulting from not consolidating the debtors.").

### 5. Conclusion: Trustee's Case in Chief

The evidence in the long, detailed, and difficult record for this motion fully supports findings in favor of the Trustee on all three factors under *Giller*. Hence, he is entitled to the relief of substantive consolidation as to all of the Debtors in this case-grouping, other than PGW.

First, substantive consolidation is "necessary" due to the proven presence of the majority of the *Vecco* and *Ouimet* interrelatedness factors, the objecting parties' reliance on the debtors' interrelatedness (or lack of reasonable reliance on the debtors' separateness), and the fact that the interrelatedness has made future accounting needs unreliable and tremendously costly if the debtors remain non-consolidated. Second, there is a clear benefit to consolidation, but little to no concrete evidence of harm to the objectors. Third, non-consolidation would prejudice creditors because the Trustee's avoidance litigation would bear far less potential return to the estates than if the debtors are consolidated and the expense of the direct administration of the estates would be significantly higher.

### POTENTIAL AFFIRMATIVE DEFENSE

█ As previously noted, *Giller's* articulation would allow the analysis to end there, and enables a ruling on the Trustee's motion. The evidence, as matched to *Giller's* three considerations, amply supports substantive consolidation even though actual, affirmative reliance on nonseparateness has not been proven as to every last objector-creditor.

Were the *Giller* standard to be modified based upon an appellate re-weighting of the merits of *Augie/Restivo's* analysis, or by adopting the mind-set of *Owens Corning*, it would be necessary to consider the respondents' *ex ante* reliance on corporate separateness as an affirmative defense. Depending upon which Circuit's articulation was adopted, a finding of sufficient reliance could defeat a prima facie case for substantive consolidation in whole or in part.

A thorough analysis of the matter of reliance has already been done, however, under the rubric of the necessity consideration—i.e., that it would be appropriate to equitably realign the legal treatment of related entities to match to the actual, manifest facts of assumption, expectancy, and treatment at the hands of most of the relevant creditors-parties.

Under most of the appellate authority that countenances the assertion of reliance as an affirmative defense, a bare statement of past, actual reliance on a legal abstraction does not trump actual melding as a matter of contract or de facto practice. Thus, particularly where an objecting creditor legally had, or expected, financial satisfaction on debt from an SPE's related entities if the SPE's own isolated means were lacking, the defense would not be available and substantive consolidation would not be barred. *Cf. In re Owens Corning*, 419 F.3d at 212 (stating "[a] *prima facie* case for" substantive consolidation exists "when, based on the parties prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguish-

able entity"). And in the alternative, where a creditor was not reasonable in relying on the separateness of its debtor-counterparty from related entities known to it, the defense is not available either.

The findings on reliance made earlier for *Giller's* first factor apply in their whole to *ex ante* reliance asserted as an affirmative defense. To the extent that a belief in non-separateness was proven to have been part of a particular creditors' reliance in its contracting with a PCI-related Debtor, or an actual expectation of recourse against or repayment from another PCI-related Debtor was so proven, the Trustee's proof would defeat the defense right there. That would be the case for all objectors other than Elistone. For Elistone, it was proven that it did not *reasonably* rely on such separateness. As a result, the defense would be equally defeated as to it.

No further discussion is needed, even were the *Giller* standard expanded to align to another circuit's view of the remedy of substantive consolidation.

## REFINEMENTS OF GRANT OF RELIEF

The case law requires attention to two other matters, on a determination that substantive consolidation is merited.

### I. Effective Date of Relief

■ In *Auto–Train,* the D.C. Circuit made it clear that the effective date of a court-imposed consolidation is not to be assigned perfunctorily to any specific date, in particular the date of the commencement of the one related case that would give the resultant estate the greatest scope of recovery in avoidance. 810 F.2d at 276–

278.[94] In the *Auto–Train* court's consideration, the temporal effectiveness of consolidation was intertwined with a different sort of creditor reliance, that implicated in the policy goals of the avoidance remedy for preferential transfers. 810 F.2d at 276–277. Thus, for that court, the determination of effective date must be attuned to the prospect of unduly extending the exposure of otherwise-accommodating creditors to avoidance and disgorgement of payments they received as part of that accommodation. *Id.*

On the other hand, in *Bonham* the Ninth Circuit accorded discretion to the bankruptcy court on this issue; while it cautioned "particular care" for the general "cautionary principles" of substantive consolidation, it left it to that discretion in a "tailor[ing] to meet the needs of each particular case." 229 F.3d at 771.

In *Giller,* the Eighth Circuit expressed no such concern. If anything, the deference it gave to preserving the prerogatives of bankruptcy estates suggests that it would reject the Second Circuit's concerns. 962 F.2d at 799.

But there is no warrant in the record to deny the Trustee's request for effectiveness as of October 11, 2008, the date of the earliest bankruptcy filing (PCI's) for the Debtors in this group. None of the objectors has challenged that. And in any event, there is no indication that aligning effectiveness to that date inequitably disserves or prejudices the interests of any creditors or any party currently in litigation with the Trustee. And, it can't be denied: deeming the collapse of the estates into one effective at the date on which the first such estate arose under bankruptcy law, only matches the deep

---

**94.** In fact, the bankruptcy court's granting of so-termed "nunc pro tunc" effect was the foremost issue brought on appeal to the circuit court in *Auto–Train,* coming as it did out of avoidance litigation in which the temporal reach of avoidance was material. 810 F.2d at 273.

interrelatedness and substantial unity among all the PCI-related Debtors, that went years back in time before then.

## II. Preservation of All Rights of Avoidance

■ The Eighth Circuit made *Giller* a strong cautionary as to one substantive consequence of substantial consolidation: while the remedy does automatically cancel all potential causes of action for avoidance of transfer that ran debtor-to-debtor within the grouping of consolidated entities, it may not be assumed that the full cumulation of avoidance causes of action held by the estates for all of the debtors before the grant of the relief, survive to be advanced by the trustee of the one post-consolidation estate. 962 F.2d at 799. The point should be addressed by specific provision in the order for consolidation. *Id. See also In re Bonham,* 229 F.3d at 768–769 (discussing *Giller* ). However, the Eighth Circuit readily ratified the bankruptcy court's preservation of the claims, and on the simple, functional ground that the benefit from retaining them and using them toward greater recovery for the consolidated mass of creditors was one of the very purposes for which the trustee had sought consolidation in the first place. 962 F.2d at 799.

Again, there is no serious issue over whether this should be done here. But the broader question of consolidation's implication for substantive postures in the litigation is very much at bar, and hence the point is decided in the Trustee's favor to avoid any future ambiguities.

### IN CLOSING

One last aspect of this whole controversy merits an observation. The objectors' resistance had many aspects: the assertions of structural separateness in SPEs that could not possibly be subject to sunder, the primacy of their assumptions in

relying on that, their clients' claim to bankruptcy-proof status, every allegation of insufficient proof on each element of the test for substantive consolidation. It all has a large hollow space behind it.

That hole is their failure to recognize just where this controversy, all the claims against them, and all of the conflict in these cases arose. It all came out of a massive fraud, directed and coordinated by one person in whom they seem to have reposed large and inordinate trust, very much to their own peculiar benefit.

But a central circumstance cannot be denied: for the very repayment of their own advances of credit, plus the substantial profits they all reaped, the objectors themselves had the actual, de facto benefit of the massive commingling and the erosion of corporate boundaries that they would now minimize by brandishing as defective bankruptcy-remoteness as a shield. The churn of later lenders' infusions across those supposedly-inviolate boundaries was one of the enablers of the objectors' enrichment, the satisfaction of their contractual claims for interest. There seems to have been no legitimate, real, and non-collusive business activity to generate revenue. Structured finance and bankruptcy-remoteness have tacit underpinnings that may be justifiable in a bona fide, lending context—a claim to protect the benefit earned from commercially-reasonable lending against recapture after the fact, in the bankruptcy of a related company that is not compromised by pre-petitioned wrongdoing. Those fundaments are lacking here.

Had the objectors' structures been more tightly constituted and then parlayed with utter consistency, they would have a stronger claim to protection from substantive consolidation ... were there not that imposthume looming over the firmament of these cases: the fraud of a Ponzi

scheme in which the objectors *and all other lenders* were participants. Some objectors got advice and counsel, but that itself excepted the operation of fraud from its assurance of protection. That carveout put a premium on self-policing, to maintain a justifiable level of comfort that all was as represented in the ongoing ostensible business of the Petters operation.

To the extent that such policing was even essayed, it was too easily blunted from Tom Petters's side. Thus the objectors gave comfort to themselves; but it had no foundation in a proper, preemptive self-protection.

The feeling of security in separateness, no doubt, was reinforced by the returns they received on their lending. The horrid fact was that those very returns were a major contributor to the damage caused to *later* lenders, the massing of huger liability to a smaller number of lenders in much larger amounts of money. They were left in at the death of the Petters scheme.

With all that, there is nothing awry about imposing this remedy in the consideration of equity—for either its immediate effect—to simplify the Trustee's job of cleaning up the mess—or for its possible extension into the theory of the avoidance litigation—to afford standing to the Trustee to avoid transfers made through the SPEs as conduits.

With the PCI-related Debtors' structure and operation as much of a piece as they were, and all creditors' inputs having served to enable and sustain the operation of the scheme through that one melded edifice, there is an argument that standing in litigation is properly derived through the breadth of a post-consolidation, aggregated debt structure. That can be addressed fully on its merits, where properly raised.

**ORDER**

On the findings of fact and conclusions of law just set forth in memorandum form,

IT IS HEREBY ORDERED:

1. The Trustee's motion is granted.

2. The cases and bankruptcy estates of Debtors:

Petters Company, Inc. [BKY 08–45257]

PC Funding, LLC [BKY 08–45326]

Thousand Lakes, LLC [BKY 08–45327]

SPF Funding, LLC [BKY 08–45328]

PL Ltd., Inc. [BKY 08–45329]

Edge One LLC [BKY 08–45330]

MGC Finance, Inc. [BKY 08–45331]

PAC Funding, LLC [BKY 08–45371]

Palm Beach Finance Holdings, Inc. [BKY 08–45392]

are consolidated, for all purposes substantive and administrative.

3. The relief accorded under Term 2 shall be retroactively effective, as of October 11, 2008.

4. All rights under applicable law to avoid transfers of the property of any of the Debtors identified in Term 2 to parties other than any of the other Debtors so identified, which rights of avoidance were originally vested in the bankruptcy estates of all such transferor-Debtors by operation of the Bankruptcy Code, are preserved for the Trustee's exercise for the benefit of the single bankruptcy estate that results from the consolidation ordered under Term 2.